IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Isabel S. Galligan, | ) | No. CV 06-657-TUC-FRZ (HCE) |
| | ) | |
| Plaintiff, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). This matter was referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to the Rules of Practice of this Court.

On July 18, 2007, Plaintiff filed a Motion for Summary Judgment (Doc. No. 14) (hereinafter "Plaintiff's MSJ").  Thereafter, Defendant filed a Cross-Motion for Summary Judgment (Doc. No. 20) (hereinafter "Defendant's XMSJ"). For the following reasons, the Magistrate Judge recommends that the District Court grant in part Plaintiff's MSJ and deny Defendant's XMSJ.

I.      PROCEDURAL HISTORY

On June 16, 2004, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") an application for disability insurance benefits under Title II and Title

XVIII of the Social Security Act alleging inability to work since December 23, 2001 due to "problems with knees, lower back and hands; blind in right eye; high blood pressure; arthritis; depression."  (TR. 80-82, 127).  Plaintiff's application was denied initially and on reconsideration. (TR. 54-57, 59, 62-65).

Plaintiff then requested a hearing before an administrative law judge and the matter was heard on November 8, 2005 by ALJ Frederick J. Graf  (hereinafter "the ALJ").  (TR. 53, 523).  Plaintiff,  represented by counsel,  testified before the ALJ.[1]  (TR. 523-531).  On January 25, 2006, the ALJ denied Plaintiff's claim.  (TR. 22-35).  On October 27, 2006, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's January 25, 2006 decision the final decision of the Commissioner.  (TR.5-8, 16).  Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

A.      Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on December 10, 1953 and was 51 years old on the date the ALJ issued his decision.  (TR.80).  Plaintiff is divorced and, at the time of the hearing, lived with her mother who was then 91 years of age.  (TR. 80, 527).  Plaintiff has three children who, at the time of the hearing, were ages 30, 28, and 26.  (TR. 527).

Plaintiff completed high school.  (TR. 133). She has had no vocational training and did not attend college.  (Id.). Plaintiff's work history includes employment as: a cashier in the retail field from September 2001 through December 2001; a "floor person to [assistant] manager" in the retail field from September 1999 through August 2000; and an "assembler/supervisor/production manager" for a medical products company from March 1983 through March 1999.  (TR. 106, 109, 128).  In 2001, when Plaintiff worked as a cashier, she worked 2 to 4 hours per day, 3 days per week.  (TR. 109).  She was required to

---

[1]The hearing lasted nine minutes.  (TR. 525-530).  Plaintiff's counsel declined the opportunity to question Plaintiff.  (TR. 530).

walk and/or stand 2 hours each day and she was not required to lift.   (Id.).  When Plaintiff
worked in the retail field from 1999 to 2000, she worked 10 hours per day 5 days per week.
(TR. 106, 108).  She supervised others and unloaded merchandise.  (TR. 108).  She was
required to walk and/or stand 8 hours each work day, she frequently lifted up to 25 pounds
and the heaviest weight she lifted was 50 pounds.  (Id.).  She was required to kneel, crouch,
handle, grab, grasp, reach, write, type and handle small objects.   (Id.).   As an
"assembler/supervisor/production manager", Plaintiff's responsibilities included supervising
and training others, setting up inventory, and weighing products.  (TR. 107, 128).  She
worked 8 hours per day 5 days per week and was required to walk 8 or 10 hours and/or stand
7 hours.  (Id.).  She frequently lifted up to 50 pounds and the heaviest weight lifted was 100
pounds or more.  (Id.)  She was required to routinely crouch, handle, grab, grasp, reach,
write, type and handle small objects. (Id.).

Plaintiff testified that she stopped working in 2001 due to "an injury at work, a
herniated disc." (TR. 529).  When asked by the ALJ why she believed she could not "do any
type of work at the present time," Plaintiff responded: "Because I have trouble with my neck,
my knees, my back.  I have a lot of trouble sleeping, so I sleep a lot during the day and then
with the medications that I take."  (TR. 529-530).

Plaintiff testified that she was five feet three inches tall and weighed approximately
265 pounds.  (TR. 528).  She smokes about five cigarettes a day.  (Id.)

Plaintiff experiences "a lot of pain..." in her left knee, lower back, and left foot.  (TR.
83).  She has muscle spasms in her lower back and up and down her legs.  (Id.).  Her right
knee also hurts but does not hurt as badly as her left knee.  (Id.).  She has pain in her arms
and hands "all the time...", her "eyes are also getting worse" and her left eye hurts and
becomes fatigued.  (Id.).  Her pain feels "[l]ike burning in my bones like if they would be
tearing all my ligaments [and] nerves in my legs [and] knees, my hands hurt allot [sic]...I
can't use them to[o] much."  (Id.).  Her left foot swells after fifteen minutes to half an hour

of Plaintiff "getting up and moving around."  (Id.).  The only time she is not in pain is when she lays down or arises in the morning.  (Id.).

Plaintiff has taken the following medications: Amitriptyline, Elavil, and Neurontin for fibromyalgia and to help her sleep; Celebrex for back pain; Cyclobenzaprine as a muscle relaxer; Arthrotec for arthritis and inflammation; Prilosec and Protonix for her stomach; Triameter for high blood pressure; Elavil, Celexa and/or Wellbutrin for depression; calcium for osteoarthritis; and Hydrocodone/Apap for pain.  (TR. 84, 132, 324, 330, 377).  Plaintiff's medications cause "clumsiness, headaches, spasms, cramps, tiredness, fatigue" (TR. 84) and dry mouth.  (TR. 132).

On a typical day, Plaintiff arises, makes coffee and breakfast, and watches the morning news.  (TR. 85; *see also* TR. 120 (Plaintiff will make breakfast if she feels well enough to do so)). Her pain prevents her from doing chores including laundry.  (TR. 85).  She will water the indoor plants if she feels "okay..." (Id.).  Plaintiff also stated that she is able to do "some cleaning inside but I have to sit down a lot."  (TR. 87).  She vacuums every other day if she feels good, it takes her 3 to 4 days to clean house and 2 days to do laundry, and she does no yard work.  (TR. 122).  Everything takes her longer to do.  (TR. 87).  She is unable to put her tennis shoes on, must sit while in the shower, and had to cut her hair short.  (TR. 86).   Plaintiff is able to drive, but has not been driving since she had surgery on her right eye four weeks before the hearing.  (TR. 88, 528-529).  She is unable to drive long distances because her eyes become tired.  (TR. 90)  She goes grocery shopping once a week.  (TR. 88; *see also* TR. 123 (she goes grocery shopping once every 2 weeks for about one hour or one and one-half hours)).   Plaintiff's sister pays all the bills and takes care of handling Plaintiff's savings account and checkbook.  (TR. 88, 123 ("I'm not working so I don't..." pay bills, handle savings or checking account or count change)).  Plaintiff's hobbies include watching television, playing cards, and sitting outside to watch her grandchildren play.  (TR. 89).  She can walk up to 10 feet before needing to stop and rest due to leg pain and swollen feet.  (TR. 90).  She cannot pay attention for long periods and must "write everything in my

appointment book or calendar."  (TR. 89; *see also* TR. 91).  Her conditions renders her unable to lift, squat, bend, stand, reach, walk, kneel, stair climb, see, remember, complete tasks, concentrate, understand and use her hands.  (TR. 90).

In her 2004 Function Report, Plaintiff stated that she uses a brace, splint and reading glasses that were prescribed by a doctor.  (TR. 91).  She also uses a "cane all the time well [sic] when I walk.  Splint at night."  (Id.).

B.     Medical Evidence Before the ALJ

1.     Plaintiff's Treating Physicians

a.     Back, Knee, Foot, and Upper Extremities

The record reflects Plaintiff's statement to health care providers that in 1999, she injured her back, suffering a herniated disc.  (TR. 188).

On December 13, 2001, Plaintiff saw Mauricio Valencia, M.D., on follow-up for complaints of back pain.  (TR. 377).  Plaintiff reported that her "back pain is doing a lot better and allergies have been much better controlled."  (Id.).  At that time, Plaintiff weighed 251 pounds.  (Id.).  A December 13, 2001 x-ray of Plaintiff's left foot showed plantar fasciitis.  (TR. 378).  Dr. Valencia's assessment was allergic rhinitis for which he prescribed Zyrtec; "[d]egenerative joint disease, back pain..." for which he continued Plaintiff on Celebrex; "[q]uestionable perimenopause..." for which he scheduled tests and prescribed Premarin and calcium carbonate; gastroesophageal reflux (hereinafter "GERD") for which he continued Plaintiff on Prevacid; and "[h]istory of left plantar fasciitis" for which he referred Plaintiff to a podiatrist.  (TR. 377).

On January 16, 2002, Plaintiff saw podiatrist Richard Quint, M.D., who assessed left heel spur syndrome.  (TR. 149).  He noted that Plaintiff had the condition for one year and that Dr. Valencia administered three injections during that time.  (Id.).  Dr. Quint prescribed oral Indocin therapy, physical therapy, and a "thick, foam, medical grade heel pad.  May benefit by use of crutches, night splint...."  (Id.).

On January 24, 2002, Plaintiff saw Dr. Valencia for complaints of right knee pain. (TR. 373). A February 13, 2002 x-ray of Plaintiff's right knee showed minor degenerative changes. (TR. 372).

A March 4, 2002 Physical Therapy Initial Evaluation completed by Pamela Kane, PT, reflected that injections to Plaintiff's left heel resulted in decreased pain for one month with the return of pain thereafter. (TR. 198). Plaintiff was unable to climb stairs, squat or kneel secondary to knee pain. (Id.). "She is significantly limited in walking 15 minutes. She is mildly limited in standing 30 minutes, cooking, cleaning, and sleeping." (Id.). Although Plaintiff had help with housework, she "does most of the housework and care needed in the home." (Id.). Plaintiff also reported having a herniated disc in the past and that she still experienced pain radiating into her left leg. (TR. 199). PT Kane's assessment was: weakness in left lower leg secondary to prior disc problem; severe pain rated at 7 to 8 out of 10 consistently in the left medial heel, decreased ability to stand and walk secondary to pain. (Id.). On March 11, 2002, after four of six authorized visits, Plaintiff was discharged from physical therapy. (TR. 196). Upon discharge, Plaintiff's weakness in the left lower leg secondary to a prior disc problem and her decreased ability to stand and walk secondary to pain remained unchanged. (Id.). Plaintiff's left heel pain decreased to 0 to 1 out of 10 with use of a TENS unit; however, the pain remained rated at 7 to 8 when the TENS unit was not in use. (Id.). She remained "limited in walking 15 minutes." (Id.).

On March 14, 2002, Plaintiff saw James Levi, M.D., for complaints of bilateral knee pain. (TR. 422). On physical examination, Plaintiff's patella was stable, there was some mild crepitus in terminal extension and "[m]ild discomfort to palpation along the joint line, both medially and laterally." (Id.). Otherwise, the examination was normal. (Id.). X-rays of Plaintiff's knees were normal. (Id.). Dr. Levi assessed bilateral knee pain. (Id.). He suspected "very early mild D[egenerative] J[oint] D[isease] although her x-rays do not show it nor does her physical examination." (Id.). Dr. Levi pointed out that Plaintiff, who weighed 250 pounds, was over 100 pounds overweight and he explained the impact of excess pressure

on her knee joints with "every step she takes" and told her that she needed to lose 100 pounds.  (Id.).

On March 15, 2002, Plaintiff presented to Dr. Valencia for a preoperative physical for clearance for foot surgery by Dr. Quint.  (TR. 368).  Dr. Valencia noted Plaintiff's past medical history of chronic back pain syndrome, "herniated thoracic disk requiring hospitalization in August of 2000...", hypothyroidism, and hyperlipidemia.  (Id.).   Dr. Valencia cleared Plaintiff for surgery provided that her laboratory results were normal.  (TR. 369).  He noted that Plaintiff's history of degenerative joint disease was stable and directed Plaintiff to continue on a diet and exercise program for obesity.  (Id.).

On March 22, 2002, Dr. Quint performed a left medial band plantar fasciotomy and medial calcaneal neurotomy.  (TR. 175).  Thereafter, Plaintiff was referred to physical therapy where she reported that prior to developing the condition, she had been without limitations with standing and walking.  (TR. 146, 193).

In July 2002, Plaintiff complained to Dr. Quint of tenderness in the heel and medial leg area.  (TR. 145).  Dr. Quint directed her to discontinue Naprosyn, prescribed oral Indocin therapy, and dispensed heel pads.  (Id.).  He indicated that if Plaintiff did not improve, he would consider referral to a pain management specialist.  (Id.).

On August 1, 2002, Plaintiff reported to Dr. Valencia that she had developed low back pain shooting down to her left leg.  (TR. 363).  On examination, Dr. Valencia noted sacral tenderness, tenderness over the sciatic notch, and a positive straight leg test.  (Id.).  He assessed low back pain with some sciatica.  (Id.).  He wrote: "Given patient's obesity and prior history of degenerative joint disease, [her complaints were] most probably about a possible herniated disc impingement-type syndrome."  (Id.).

On August 13, 2002, Plaintiff saw Jon Ostrowski, M.D., regarding left low back pain and numbness in the left lower extremity with pain in that area as well.  (TR. 150).   Dr. Ostrowski noted that Plaintiff walked with a mild left antalgic gait.  (Id.). On physical examination, Dr. Ostrowski found that Plaintiff's muscle strength was 5/5 in the bilateral

lower extremities; she had generalized tenderness to palpation of the left greater than right lumbosacral paraspinal musculature; her lumbar spine range of motion was "pain inhibited in all directions"; and she had no muscle spasm.  (Id.).   Sensory examination showed " a circumferential mild diminishment of pinprick sensation involving the left lower extremity. The diminishment of sensation does not follow any particular nerve root or peripheral nerve pattern." (Id.). Dr. Ostrowski's impression was: (1) lumbosacral strain injury superimposed on lumbar degenerative arthritis; and (2) left lower extremity numbness. (TR. 150-151).  He noted that Plaintiff had complained of numbness in her left leg "since her industrial injury. There was no abnormality seen on the lumbar MRI scan that correlated with this symptom." (Id.).  He recommended a nerve conduction study and re-examination in a few months.  (Id.). Also on August 13, 2002, Plaintiff was discharged from physical therapy for her left foot after having presented for all authorized visits.  (TR. 191-192).  Plaintiff had "not report[ed] improvement in symptoms...." (TR. 192).  Plaintiff  could not tolerate standing or walking for 30 minutes, she had not increased strength of the left ankle musculature to greater than or equal to 4+/5, and  she had not increased range of motion of the right ankle with regard to dorsiflexion.  (Id.).  She had increased range of motion of the right ankle with regard to eversion.  (Id.).

On August 16, 2002, Plaintiff saw neurologist Robert Foote, M.D., regarding pain in her left buttock area going down her left leg into her calf and Achilles' tendon, and numbness and tingling in that area.  (TR. 165).  On physical examination, Plaintiff did "not have any definite weakness.  Deep tendon reflexes are somewhat hypoactive but symmetrical." (Id.). Sensory examination showed Plaintiff had "mild decreased sensation to pinprick over..." her left foot, vibratory sense and joint position were intact, and straight leg raising caused pain down the back of her leg.  (TR. 166).  Plaintiff was able to walk on her toes and heels but was unable to flex her spine.  (Id.).   To rule out lumbar radiculopathy on the left, Dr. Foote ordered a nerve conduction study.  (Id.).   Such study was normal. (TR. 158; *see also* TR. 159-164).  Dr. Foote also noted that a previous MRI also normal.  (TR. 158).  Because "there

is no evidence that she has a lumbar radiculopathy", he opined that "this boils down to a pain problem..." and returned her to Dr. Valencia's care. (Id.).

On September 30, 2002, Plaintiff reported to Dr. Valencia that her back pain "has improved somewhat..." and she was beginning to walk more. (TR. 358). Dr. Valencia's assessment included morbid obesity and that Plaintiff's chronic back pain and GERD were stable. (Id.). One month later, Plaintiff complained to Dr. Valencia about back pain, especially in the thoracic spine area, resulting from "some lifting...." (TR. 353). On examination of Plaintiff's back, Dr. Valencia noted that Plaintiff had decreased flexion with diffuse spasm, post cervical tenderness in the thoracic spine and some tenderness in the perivertebral musculature with spasm. (Id.). His assessment was chronically elevated liver function test, GERD, back strain for which he prescribed Flexeril and physical therapy, morbid obesity for which Plaintiff was to continue on current diet and exercise, and depression "[s]eemingly improved on Celexa." (TR. 353-354).

In November 2002, Plaintiff began physical therapy for back pain. (TR. 188) During the intake evaluation she reported that she had recently received new orthotics which helped her foot and leg pain and she was walking much better. (Id.). Upon discharge in December 2002, Plaintiff reported she was "feeling much better with decreased pain. She is able to sleep, and do laundry with decreased pain. Patient is able to do all of her functional activities with about 3-4/10 intermittent pain symptoms." (TR. 186). Plaintiff also increased range of motion. (Id.).

On December 20, 2002, Plaintiff complained of painful joints relating to her hands. (TR. 349). On examination, both wrists were tender and small nodules were present. (TR. 350). Diagnosis included morbid obesity and questioned whether rheumatoid arthritis was at issue. (Id.).

A March 28, 2003 x-ray of Plaintiff hands and wrists showed minor degenerative findings. (TR. 348).

On April 8, 2003, Plaintiff complained to Lisa Soltani, M.D., of pain in her knees, ankles, elbows, wrists, clavicles, numbness in her first and third fingers, and night pain.[2] (TR. 344) Dr. Soltani assessed chronic pain and questioned whether Plaintiff suffered from degenerative joint disease or fibromyalgia. (TR. 345). Wrist splints were prescribed. (Id.).

On May 22, 2003, Plaintiff complained to Dr. Soltani[3] of pain and numbness in her hands and diffuse pain. (TR. 341). Plaintiff said that splints helped relieve some of the symptoms in her hands but that the symptoms still persisted. (Id.). She was taking Naprosyn. (Id.). Dr. Soltani's assessment was: (1) probable carpel tunnel syndrome for which she should continue with splints and Naprosyn; and (2) "probable fibromyalgia" for which Elavil was prescribed. (TR. 342). Dr. Soltani also discussed with Plaintiff a fibromyalgia support group and pain control modalities. (Id.).

On July 23, 2003, Plaintiff saw Dr. Foote for complaints of pain and paresthesias in her upper extremities. (TR. 156) On examination, Dr. Foote found Plaintiff had dysesthesias to pinprck over digits 3 through 5 of her left hand, positive Tinel's sign at the left elbow, normal strength in both upper extremities. (Id.)

On September 3, 2003, Plaintiff complained to Dr. Soltani of chronic pain in her neck, shoulders, hands, occipital and lower back; depression about money, caring for Plaintiff's mother, Plaintiff's weight and that she "can't exercise"'; and dyspepsia. (TR. 337). Dr. Soltani noted that Plaintiff's upper-extremity EMG and nerve conduction studies were negative. (Id.). Dr. Soltani assessed depression, chronic pain, and suspected fibromyalgia. (TR. 338). She prescribed Naprosyn, Zoloft, weight loss and low-impact aerobics. (Id.).

---

[2] One word is omitted from Plaintiff's complaints because it is illegible.

[3] Defendant attributes to Dr. Soltani this record as well as other records wherein "Ei" is identified as the provider. (Defendant's Statement of Facts, ¶¶ 20-23). The signature on the records wherein Ei is identified as the provider is similar to Dr. Soltani's signature as it appears on other records and Plaintiff has not disputed that Dr. Soltani was the provider. (*Compare* TR. 341-342 to TR. 345; *see also* TR. 329-330, 334-335, 337-338). Hence, the Court accepts Defendant's attribution.

Plaintiff returned to Dr. Soltani on October 8, 2003 with continued complaints of diffuse pain and depression. (TR. 334).  Dr. Soltani injected Plaintiff with a Lidocaine solution, prescribed Elavil and continued physical therapy, exercise and weight loss for fibromyalgia and Celexa for depression.  (TR. 335).

In October 2003, Plaintiff began physical therapy regarding tenderness throughout her upper body, elbows and hands.  (TR. 182). By her November 7, 2003 discharge, Plaintiff's condition was unchanged.  (Id.)  Physical Therapist Matthew Wilkinson noted that Plaintiff "has also injured her lower back[4]...The back and neck have become integrated and because of her fibromyalgia it is felt that her best method of treatment would be aquatic therapy." (Id.).  PT Wilkinson planned to address Plaintiff's "entire spine" with additional therapy if such was approved.  (Id.).

On November 14, 2003, Plaintiff returned to Dr. Soltani with complaints of diffuse pain in her lower back, elbows, knees and neck.  (TR. 329).  Plaintiff was frustrated by Dr. Soltani's focus on Plaintiff's weight.  (Id.).  Plaintiff did not benefit from physical therapy for her neck.  (Id.).  Plaintiff was continued on Elavil for fibromyalgia and pool therapy was prescribed.  (TR. 330).

On December 10, 2003, Plaintiff began physical therapy consisting of aquatic therapy for her back.  (TR. 179-181, 183–185).   Plaintiff was discharged from physical therapy in March 2004.  (TR. 177-178).  Plaintiff had achieved increased flexibility and decreased pain with overall functional activities.  (TR. 177).

On December 31, 2003, Plaintiff reported to Dr. Soltani that she still felt pain in her elbows, knees, arms, and ribs during the pool physical therapy but she felt better immediately afterwards.  (TR. 325).  Elavil did not significantly decrease her pain.  (Id.). Plaintiff denied

---

[4]Plaintiff reported injuring her lower back while "transferring her mother to clean and bathe her."  (TR. 183; *see also* TR. 332 (Plaintiff's October 2003 report of back pain and Dr. Soltani's assessment of "acute on chronic..." low back pain)).

depression.  (Id.).  Dr. Soltani assessed "chronic pain/fibromyalgia", ordered a bone scan, and discussed use of Neurontin  in place of Elavil.  (TR. 326).

On February 2, 2004, Dr. Soltani noted Plaintiff's continued complaints of diffuse pain primarily in her right elbow, right forearm, right wrist, bilateral hands, bilateral knees, and low back.  (TR. 323).  Dr. Soltani opined that Plaintiff suffered from "[p]ain syndrome, possible fibromyalgia and degenerative joint disease."  (Id.).  She noted that laboratory evaluations, x-rays, a bone scan, and an EMG of Plaintiff's upper and lower extremities were "unrevealing with the exception of some mild arthritis in her knees."  (Id.; *see also* TR. 324 (noting "negative ANA, rheumatoid factor and sedimentation rate as well.")).  Plaintiff  had decreased her weight from 269 to 256.  (TR. 323).  Dr. Soltani also noted that Plaintiff was taking Celexa as well as Elavil for depression "and she tells me she is not currently suffering any symptoms of depression."  (Id.).  On examination, Plaintiff's knees had full range of motion although there was some tenderness at the lateral right knee joint line.  (Id.).  Dr. Soltani "believe[d] that a large component of [Plaintiff's] pain symptom is related to fibromyalgia." (TR. 324).  She prescribed Neurontin and advised Plaintiff to continue taking Arthrotec as needed for pain and to continue with physical therapy. (Id.).  Dr. Soltani also continued Plaintiff on Celexa and Elavil for depression.  (Id.).  She advised Plaintiff to continue losing weight.  (Id.).

A February 6, 2004 x-ray of Plaintiff's knees showed minor degenerative findings and slight progression of degenerative changes in the right knee when compared to a 2002 study. (TR. 322).  A February 6, 2004 x-ray of Plaintiff's elbow was normal.  (Id.).

On March 2, 2004, two years afer her last appointment with Dr. Levi, Plaintiff returned with complaints of pain and swelling in both knees.  (TR. 421).  Physical examination showed "an effusion in both knees, right greater than left.  She has a lot of pain along the joint line and in the patellofemoral articulation."  (Id.)  Plaintiff's x-rays "look[ed] pretty good."  (Id.).  Dr. Levi noted that Plaintiff "really hasn't lost any weight..." since her last visit and questioned whether Plaintiff suffered from degenerative joint disease, meniscal

tears, or whether her weight was "just finally honing in on her."  (Id.).  He ordered an MRI.  (Id.).

On April 14, 2004, Plaintiff underwent arthroscopic surgery on her left knee, performed by Dr. Levi,  for torn medial meniscus repair.  (TR. 202-203, 417).

In May 2004, Dr. Soltani noted Plaintiff's continued complaints of pain in her elbows, wrists, ankles, knees and lower back.  (TR. 318).  Dr. Soltani's assessment included fibromyalgia and depression.  (TR. 319).  Plaintiff was continued on Neurontin, Elavil, Arthrotec.  (Id.).

On May 25, 2004, Kevin Bowers, M.D., on referral from Dr. Soltani, examined Plaintiff for complaints of bilateral elbow pain and tingling in the index finger of her right hand.  (TR. 419-420).  Physical examination was unremarkable except for tenderness "to palpation along the area of the common flexor origin about the medial elbow bilaterally." (TR. 419).  Tinel's testing of the elbow and wrist was "fairly unremarkable."  (Id.).  Dr. Bowers assessed "[b]ilateral medial epicondylitis with some right sided lateral epicondylitis" and  recommended  bilateral  tennis  elbow  supports,  icing  and  continuation  of  anti-inflammatory medication.  (TR. 419-420). Dr. Bowers noted that if conservative treatment did not help, injections should be considered.  (TR. 420).

In June 2004, Dr. Soltani noted Plaintiff's complaints of continued pain and continued Plaintiff on her current medication.  (TR. 316-317).  She also noted Plaintiff's flat affect and normal gait.  (TR. 317).

On June 11, 2004, Plaintiff presented to Dr. Levi because she had tripped and fallen a few days earlier.  (TR. 418) Physical examination revealed a small effusion, otherwise, she was "doing okay.'"  (Id.).

On July 23, 2004, Plaintiff saw Dr. Levi on follow up for her arthroscopic surgery to her left knee.  (TR. 417).  When Plaintiff reported "that her knee continues to be somewhat problematic", Dr. Levi noted that such situation was "not terribly surprising because of the degenerative stuff that is going on in her knee.  A lot of this is patellar.  It produces debris

and that is probably what is going on...Unfortunately at 246 pounds and 5 feet, 3 inches she can do more for her knee right now than I can and we talked about this.  She needs to get serious about losing weight."  (Id.).

In July 2004, Dr. Soltani continued Plaintiff on Neurontin, NASIDS, and SSRIs.  (TR. 311-312).  She also referred Plaintiff to a fibromyalgia support group.  (TR. 312).

On August 30, 2004, Plaintiff presented to the hospital emergency room complaining of left knee swelling and pain that worsened with weight bearing.  (TR. 218-219).  Plaintiff rated her pain at ten out of ten.  (TR. 218).  Physical examination revealed that Plaintiff's left thigh was swollen, tenderness in the posterior calf, a small effusion with well-healed surgical scars, and a positive Homans sign.  (Id.).  Plaintiff was administered intra-venous Demerol and Phenergan.  (TR. 219).  A left leg venous duplex ultrasound showed no evidence of left leg deep vein thrombosis.  (TR. 220, 308).  Plaintiff was released with a knee immobilizer, a prescription for Percocet, and instructions to use a walker because "[s]he cannot use crutches...."  (TR. 219).

An August 2004, an x-ray of Plaintiff's left foot showed a plantar spur which was slightly increased in size compared to the December 13, 2001 x-ray.  (TR. 309).

On September 7, 2004, Plaintiff saw Dr. Levi on follow-up for her knee. (TR. 416).  She was wearing the knee immobilizer she had received from the hospital in August.  (Id.).  She complained of pain in both knees but more so on the left than the right.  (Id.).  Plaintiff had good range of motion in her left knee, a "tiny bit of pseudolaxity" and discomfort to palpation over the patellar tendon area.  (Id.).  X-rays showed "some subtle increase in joint space narrowing in the medial compartment of her left knee."  (Id.).  Dr. Levi concluded that Plaintiff "has had some progression of her..." degenerative joint disease.  (Id.).  He discussed the influence of Plaintiff's weight on her condition and injected her knee with a mixture of Lidocaine, Marcaine, and Aristospan.  (Id.).  On September 30, 2004, Dr. Levi noted that the injection administered earlier that month had not helped Plaintiff and that she had gained

- 14 -

weight since that last visit as well.  (TR. 415).  He recommended Visco supplementation and if that did not work, then surgery.  (Id.).

On October 12, 19, and 26, 2004, Dr. Levi injected Hyalgan for Plaintiff's knee pain. (TR. 412-414).  By November 4, 2004, Dr. Levi concluded that the Hyalgan injections were not helping Plaintiff.  (TR. 411) He suspected that Plaintiff's pain could be coming from her back.  (Id.).  "I don't know that I have much to offer her as far as her knee is concerned considering the fact that at arthroscopy her knee didn't really look all that bad and I have done all the conservative things I know how to do."  (Id.).

Also in November 2004, Plaintiff saw Eugene Mar, M.D., regarding back pain.  (TR. 407-410).  She reported that her pain began sometime in March 2004 and that she had an "onset of some back pain" in 2000 or 2001.  (TR. 407).  On physical examination Dr. Mar noted no muscular spasm, sensation was within normal limits, and lower extremity strength was within normal limits.  (TR. 408).  On flexion, Plaintiff experienced 75% loss of motion with back pain, extension was full but with back pain.  (Id.).  She felt pain in her left buttock when extending with rotation and with lateral side bending, although she was able to perform such movement fully.  (Id.).   Straight leg raising while seated was 90 degrees on the right with posterior thigh pain, left was 70 degrees with leg pain.  (TR. 408-409). With straight leg raising lying on the right, range of motion was to 30 degrees with groin pain and was 20 degrees on the left with leg pain.  (TR. 409).   X-rays of Plaintiff's hip joints, pelvic ring, sacroiliac joints and lumbar spine were within normal limits.  (Id.).  Dr. Mar assessed lumbar spine pain and bilateral leg pain.  (Id.)  He recommended physical therapy.  (Id.).

On December 1, 2004, Plaintiff presented to Dr. Soltani at El Rio Health Center complaining of pain in her low back, left leg, foot, and both knees.  (TR. 302) She reported that injections had not been helpful.  (Id.) Plaintiff returned to El Rio Health Center on December 16, 2004 complaining of burning pain in her left scalp, neck, shoulder and elbow. (TR. 301).   She was seen by Mark Vietti, M.D., who assessed left "C6-7 cervical radiculopathy vs. flare her [sic] fibromyalgia."  (Id.; *see also* TR. 206)) Plaintiff was directed

- 15 -

to use heat, stretching and massage. (TR. 301).   A January 4, 2005 x-ray showed that "[t]he alignment of the vertebral bodies is satisfactory.  Slight narrowing is noted at C5-6, most consistent with discogenic degenerative change."  (TR. 300).

On December 22, 2004, Plaintiff returned to Dr. Mar with complaints of pain in the back, left leg, and neck into her left arm.  (TR. 405).  Plaintiff had normal motor strength and sensation in her lower extremities.  (Id.).  She walked with some flexion of her toes in her left foot.  (Id.).  Dr. Mar noted that he had approval to see Plaintiff for her back only and not for neck and arm pain.  (Id.)  He assessed lumbar spine pain and bilateral leg pain.  (Id.)  Dr. Mar ordered an MRI which showed "[n]o disk herniations.  Some facet degenerative joint disease at L5-S1 and to a lesser extent L4-5.  T11-T12 some mild degenerative disk disease changes with no canal or foraminal stenosis."  (TR. 403).  In January 2005, in light of the MRI, Dr. Mar assessed L4-L5 and L5-S1 facet arthritis and indicated that injections should be considered.  (TR. 403-404).  He recommended physical therapy and that Plaintiff lose weight to "help some of her peripheral joint difficulties."  (TR. 404).

On October 24, 2005, Plaintiff underwent a functional capacity evaluation by physical therapist Karen McLearran.  (TR. 71-75).  PT McLearran found that Plaintiff could sit for seven minutes at a time with decreased tolerance as time progressed; Plaintiff could not stand in one place for more than two minutes; and Plaintiff could not walk for more than 20 feet at a time before needing to rest.  (TR. 72).  PT McLearran concluded that Plaintiff was unable to work for prolonged periods even at a sedentary level.  (Id.).

### b.    GERD

In December 2001, Dr. Valencia noted that Plaintiff was being treated for GERD. (TR. 377).

A June 17, 2002 abdominal sonogram was normal.  (TR. 366).  In July 2002, Plaintiff complained  about episodes of heart burn with some epigastric discomfort.  (TR. 364).  On examination, Plaintiff exhibited epigastric tenderness.  (Id.)  The assessment was GERD,

depression, plantar fasciitis, and high lipids.  (TR. 365).   In September 2002, Dr. Valencia noted that Plaintiff's GERD was stable and he prescribed diet pills.  (TR. 358).

On November 1, 2002, Gastroenterologist Scott Blinkoff, M.D., performed an endoscopy of Plaintiff's upper GI tract and assessed Barrett's esophagus and gastritis.  (TR. 173 *see also* TR. 152).  Plaintiff was prescribed Prevacid.  (Id.).

At a December 4, 2002 follow-up appointment, Dr. Valencia noted that Plaintiff's GERD was stable.  (TR. 351).  He assessed chronic elevated liver function tests; history of GERD which continued to improve with present therapy; depression which was stable; back strain which was doing well with Flexeril; and morbid obesity which was doing well with Xenical.  (Id.).

On December 19, 2002, Dr. Blinkoff saw Plaintiff for elevated liver tests and reflux. (TR. 153). Dr. Blinkoff opined that Plaintiff's transaminase elevation was most likely from fatty steatosis and he changed her medication for mild epigastric discomfort to Nexium. (Id.). On February 4, 2003, after conducting a colonoscopy, Dr. Blinkoff diagnosed hemorrhoids and pan diverticulosis.  (TR. 172). He recommended a high fiber diet.  (Id.). On April 4, 2003, Dr. Blinkoff noted an unremarkable physical examination and that Plaintiff did better on Nexium than Protonix.  (TR. 152).   He ordered a sonogram which showed an abnormal gallbladder wall.  (Id.; TR. 171).

On June 3, 2003, Plaintiff saw Steven Vaughan, M.D., upon referral from Dr. Blinkoff regarding symptomatic cholelithiasis.  (TR. 155) Plaintiff told Dr. Vaughan about her "long history of postprandial bloating and belching with pain and occasional nausea and vomiting particularly with greasy foods."  (Id.).  Her physical examination was "pretty unremarkable without evidence of cholecystitis at [that] time."   (Id.).   He scheduled an outpatient laparoscopic cholecystectomy.  (Id.).  Plaintiff underwent the procedure on June 10, 2003. (TR. 168-169).  By June 30, 2003, Dr. Vaughan reported that Plaintiff was doing well and discharged her from his care.  (TR. 154).

- 17 -

On June 30, 2004, Plaintiff presented to the emergency room complaining of right upper quadrant pain. (TR. 208). Chest x-rays were negative. (Id.; TR. 215). An ultrasound of Plaintiff's right upper quadrant showed fatty infiltration of the liver and was otherwise normal. (TR. 214). An ultrasound of Plaintiff's abdomen showed diffuse bowel gaseous distention consistent with diffuse bowel ileus. (TR. 207). Upon Plaintiff's July 1, 2004 discharge, Dr. Vietti, opined that Plaintiff's condition was "due to hypomotility of the smooth muscle of the GI tract and [he] urged that she consider discontinuing for now both the [A]mitriptyline and the Wellbutrin." (TR. 205) He also asked her to reduce and discontinue, if possible, her narcotic analgesics. (Id.). She was prescribed Reglan. (Id.).

On December 14, 2004, Plaintiff presented to the emergency room complaining of chest pain. (TR. 291). X-rays showed no abnormality. (TR. 293). The pain was "diagnosed as coming from the chest wall. This is often caused by straining the muscles or joints in the chest during physical activity, direct trauma, coughing, or vigorous vomiting." (TR. 291). Plaintiff was instructed to rest. (Id.).

c.   Vision

In September 2004, Plaintiff presented with complaints of pain from her neck to her temple. (TR. 306). Assessment included chronic neck tension and eye strain. (TR. 307) On October 18, 2004, Plaintiff was examined by Jason Levine, M.D., who noted that Plaintiff had a history of trauma to her right eye due to an accident when she was six years of age. (TR. 244, 448). Dr. Levin's diagnosis was NSC/PSC right eye, old trauma to right eye with macular scarring, and hyperopia. (Id.). He concluded that Plaintiff could perceive light only peripherally with her right eye and that she was gradually becoming blind in that eye. (Id.) He assessed visual acuity of Plaintiff's left eye at "20/30$^{-2}$." (Id.) He also noted that Plaintiff wears over-the-counter reading glasses. (Id.). On July 1, 2005, Plaintiff complained to Dr. Levine that light was "bothersome" to her left eye during the last one and one-half months. (TR. 447). Dr. Levine assessed visual acuity of Plaintiff''s left eye at 20/50. (Id.). His diagnosis was the same as on Plaintiff's previous visit except that he also included ocular

- 18 -

hypertension greater in right eye than left. (Id.).  On July 19, 2005, Plaintiff complained of eye redness.  (TR. 446).  Dr. Levine  considered administering an alcohol or Thorazine injection.  (Id.).  Visual acuity of her left eye was assessed at 20/25.  (Id.). On October 21, 2005, Plaintiff reported being unable to open her right eye.  (TR. 445).  Dr. Levine administered an injection of alcohol.  (Id.).  Visual acuity of Plaintiff's left eye was assessed at 20/25.  (Id.).

### d.    Mental

In May 2004, Plaintiff presented at La Frontera Center, Inc.   (TR. 270-290). According to Andrea Carrizoza of La Frontera, Plaintiff "presented moderately depressed and feels a lack of support from family members."  (TR. 270).  Ms. Carrizoza assessed Plaintiff's Global Assessment of Functioning Score (hereinafter "GAF") at 60. (Id.). Plaintiff's diagnosis included depressive disorder not otherwise specified and alcohol dependence.  (TR. 283).

A May 27, 2004 record from La Frontera indicates as the "[r]eason for the [r]eferral/[c]urrent [i]ssues:" that Plaintiff "is taking care of her mother and has been."  (TR. 274).  Plaintiff also stated that she was seeking services for her depression.  (TR. 268; *see also* TR. 269).

In June 2004, Plaintiff began meeting with La Frontera Counselor Amy Shiner.  (TR. 266).  At their first meeting on June 10, 2004, Plaintiff reported feeling physical pain daily, that she had poor short-term and long-term memory, and that she cared for her 90-year old mother who had diabetes.  (Id.).  Counselor Shiner noted that Plaintiff "is in significant physical pain and is depressed."  (Id.).

On June 17, 2004, Justin John Egoville of La Frontera assessed Plaintiff's GAF score at 65.  (TR. 264).  On that same date, Ellen McVay, R.N., of La Frontera prescribed Wellbutrin. (TR. 265).  On June 29, 2004, Plaintiff reported that she did not feel any positive effects from the Wellbutrin.  (TR. 263).

- 19 -

On July 2, 2004, Plaintiff reported by telephone to Counselor Shiner that she had gone to the hospital the day before "because she was suffering from extreme anxiety; 'everything was going too fast;' client was terrified."  (TR. 262).  Hospital staff "suggested she was taking too many meds (Wellbutrin, hydrocodone, etc[.]) at once which caused negative interaction; client feels better today."  (Id.).  Counselor Shiner noted that Plaintiff was calm during the call.  (Id.).  Records through the end of July note Plaintiff's physical distress and that Plaintiff was making progress with her mental health goals.  (TR. 259-260).

By late August 2004, Nurse McVay noted that Plaintiff was "[f]eeling much better since Wellbutrin started.  Continues to live at her mother's.  Less tired.  More energy.  Sleeping well.  51 [year old] female [with] cane.  Good ADL's.  Euthymic [with] full range affect.  Speech RRR.  Good eye contact."  (TR. 256).  Nurse McVay decreased Plaintiff's dose of Wellbutrin due to Plaintiff's fibromyalgia.  (Id.).

On September 7, 2004, Counselor Shiner noted Plaintiff's complaints of severe pain in her knee, feelings of anger and sadness, and crying jags.  (TR. 255).  Counselor Shiner noted that Plaintiff was making progress toward her weight loss goal and she was "also making some progress toward goal of decreasing depressive symptoms but would like to experience[] further decrease."  (Id.).  On September 24, 2004, Plaintiff missed an appointment because she was feeling depressed and her knees were hurting her.  (TR. 254).

In November 2004, Plaintiff reported to Nurse McVay that the Wellbutrin made her feel edgy.  (TR. 251).  Plaintiff also stated that she woke easily and became tired frequently. (Id.).  Nurse McVay noted that Plaintiff was alert, oriented, "[g]ood ADL's.  Euthymic [with] full range affect.  Good eye contact.  Speech RRR.  T[hought] P[rocess] linear...Insight/[judgment] o.k." (Id.). Nurse McVay lowered the Wellbutrin dosage and also prescribed Hydroxyzine for anxiety.  (Id.).  Later that month, Plaintiff reported to Counselor Shiner that she was feeling "emotionally better..." and that the anxiety medication was helping.  (TR. 247).  Counselor Shiner wrote that Plaintiff was "making progress evidenced by decrease in anxiety symptoms."  (Id.).

2.      Examining State-Agency Source

On February 10, 2005, Eugene Campbell, Ph.D., performed a psychological examination of Plaintiff at Defendant's request.  (TR. 386-391).  Plaintiff reported trouble sleeping, fatigue, headaches, anxiety, crying easily, no enjoyment of life, difficulty concentrating, forgetfulness, and pain in her lower back and knees.  (TR. 386-387).  "When she feels good, she does the laundry and vacuums.  Within a few hours, she starts hurting.  It ends up taking her three days to do her laundry.  She eats a lot, constantly."  (TR. 386).  Dr. Campbell also reported that

> [w]hen [Plaintiff] feels good, she cleans and does the laundry.  She rests and then does the dishes. She sits and watches TV.  She vacuums and sits down.  When her headaches come, she lies down.  She checks the mail. She feeds her birds.  She goes to the grocery store.  If she does not have to go out, she will not.  When she feels bad, she does nothing until her headache goes away.  Then, whatever she does, she does slowly.

(TR. 389).

Dr. Campbell noted that: Plaintiff  carried a cane and walked slowly; her affect was appropriate; her mood was depressed; her thoughts were logical, clear and linear; her abstract thinking, judgment, and insight were adequate; and she was oriented to person, place, time and situation.  (TR. 388).  Although Plaintiff had no difficulty concentrating in conversation, "[s]he incorrectly spelled 'world' backwards....In performing the serial sevens, she made several mistakes in spite of taking her time and counting on her fingers....She repeated a phrase incorrectly, substituting one word for another."  (Id.)  As to memory, Plaintiff could name the current and prior U.S. presidents and recall details about her life, she remembered three words immediately but did not remember three other words after a few minutes.  (Id.).

Dr. Campbell concluded that Plaintiff was "depressed, mostly as a result of other factors in her life, but also in response to her pain.  Cognitive abilities are poor...."  (TR. 389).  He suspected that Plaintiff had borderline intelligence which would limit her ability to learn, remember, and understand.  (Id.).  He indicated that Plaintiff's memory was poor, her concentration was "sporadic and limited, but not precluded.  She can concentrate for two

hours at a time on simple tasks.  She can refocus when interrupted." (Id.).  Plaintiff did not handle stress adequately, she was not dependable and reliable, but she had adequate judgment and could make simple, work-related decisions.  (Id.).   Dr. Campbell diagnosed major depressive disorder, recurrent, moderate; cognitive disorder not otherwise specified; and anxiety disorder not otherwise specified.  (TR. 390).   He opined that with continued treatment, the prognosis was fair for a further reduction of depressive symptoms.  (TR. 389).

Dr. Campbell completed a Medical Source Statement of Ability To Do Work Related Activities (Mental) wherein he indicated that Plaintiff, due to depression, poor memory, low intelligence, low motivation, low interest, and low energy, was markedly limited (no useful ability) in her abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent  pace without an unreasonable number and length of rest periods.  (TR. 393-394).   For these same reasons, Dr. Campbell found Plaintiff was moderately limited (fair/limited but not precluded): in her ability to perform activities within a schedule, maintain regular attendance, and be punctual. (TR. 394).  He also indicated that Plaintiff, due to poor memory and low intelligence, was moderately limited (fair/limited but not precluded) in her abilities to: remember locations and work-like procedures. (TR. 392). Plaintiff was not significantly limited (good/mild limitations) in her abilities to: understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or

use public transportation; and set realistic goals or make plans independently of others.  (TR. 393-397).  Dr. Campbell opined that Plaintiff was capable of managing benefit payments in her own interest.  (TR. 397).

3.      Non-examining State Agency Physicians

a.      Physical Impairments

In September  2004, Robert Estes, M.D., completed a Physical Residual Functional Capacity Assessment wherein he opined that Plaintiff: could lift up to 20 pounds occasionally and up to 10 pounds frequently; could stand and/or walk about 6 hours in an 8-hour work day; could sit about 6 hours in an 8-hour work day with normal breaks; and had no limitations with pushing and/or pulling using upper or lower extremities.  (TR. 223).   To support this conclusion, Dr. Estes stated:

> Morbid obesity with BMI 44.  Bilateral knee pain with imaging confirmation of mild degenerative knee joint disease bilaterally with torn medial meniscus noted in repair 4/04. Chronically elevated liver function tests without evidence of systemic deficit.  Chronic gastritis and gastroesophageal reflux with organisms resembling helicobater pylori.  Decreased strength in left extensor hallicus longus and diminished sensation dorsum of medial aspectd [sic] of left foot.  Gait normal until left heel syndrome in March '04 with durational problems of walking, stair climbing, squatting, or kneeling following treatment for same.  Nerve conduction testing of left leg normal.

(TR. 223-224).

Dr. Estes further indicated that Plaintiff could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.  (TR. 224).  She should never climb ladders, ropes. or scaffolds.  (Id.).  She could balance frequently.  (Id.). Dr. Estes also found that Plaintiff should avoid concentrated exposure to vibration and hazards such as machinery or heights. (TR. 226).  Dr. Estes found no manipulative, visual or communicative limitations were established by the record.  (TR. 225; *see also* TR. 229 ("Loss of vision in right eye not documented but visual loss in one eye is non-severe deficit.").

In February 2005, R. Hirsch, M.D., completed a Physical Residual Functional Capacity Assessment wherein he opined that Plaintiff: could lift up to 20 pounds occasionally and up to 10 pounds frequently; could stand and/or walk about 6 hours in an 8-hour work

day; and could sit about 6 hours in an 8-hour work day with normal breaks. (TR. 438) Dr. Hirsch made no finding with regard to limitations in pushing and/or pulling using upper or lower extremities. (Id.). Dr. Hirsch further found that Plaintiff could occasionally climb stairs, stoop, kneel, crouch, and crawl. (TR. 439). She should never climb ladders. (Id.). Dr. Hirsch opined that Plaintiff should avoid concentrated exposure to hazards such as machinery or heights. (TR.441). Dr. Hirsch further indicated that Plaintiff could frequently climb ramps and balance. (TR. 439). Dr. Hirsch found no manipulative, visual or communicative limitations were established by the record. (TR. 440-441).

b.    Mental Impairments

In September 2004, psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique form wherein he indicated that Plaintiff's mental impairment, which he classified as affective disorder, depression not otherwise specified, was not severe. (TR. 230). He indicated that Plaintiff was mildly restricted with regard to activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace. (TR. 240). Dr. Tangeman noted that in February 2004, Plaintiff denied symptoms of depression. (TR. 242). "She has been seen for counseling [at La Frontera Clinic with] minimal depressive..." symptoms. (Id.). He found Plaintiff to be "partially credible." (Id.).

In February 2005, Ronald G. Nathan, M.D., completed a Psychiatric Review Technique form wherein he indicated that Plaintiff was moderately limited in maintaining concentration, persistence, and pace. (TR. 433). He also indicated that Plaintiff was mildly restricted with regard to: activities of daily living and maintaining social functioning. (TR. 433). When noting Dr. Campbell's concern that Plaintiff had borderline intelligence, Dr. Nathan pointed out that Plaintiff completed high school with no learning problems and that she worked for 15 years in the manufacturing field until she was limited by pain. (TR. 435). He also noted that Plaintiff "completed ADL's on [her] own [with] adequate literacy" and that she was "[s]ocially adequate." (Id.). He stated that the medical evidence of record partially supported Plaintiff's allegations. (Id.).

Dr. Nathan also completed a Residual Functional Capacity Assessment wherein he indicated that in the area of understanding and memory, Plaintiff was moderately limited in her ability to understand and remember detailed instructions; but, she had no significant limitation in her abilities to remember locations and work-like procedures and to understand and remember very short and simple instructions.  (TR. 398).  In the area of sustained concentration and persistence, Plaintiff was moderately limited in her abilities to carry out detailed instructions and to maintain attention and concentration for extended periods; but, she was not significantly limited in her abilities to carry out very short and simple instructions, to perform activities within a schedule or maintain regular attendance and be punctual, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, and to make simple work-related decisions.  (Id.).  In the area of sustained concentration and persistence, Plaintiff was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (TR. 399).  Plaintiff was not limited in any of the five categories of social interaction.  (Id.).  In the area of adaptation, Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting; but, she was not significantly limited in her abilities to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Id.).  Dr. Nathan further stated that Plaintiff could recall and "do simple tasks [with] adequate..." concentration, persistence and pace, she was socially appropriate, and she had a "[s]omewhat decreased stress tolerance."  (TR. 400).

C.    Lay Statements

Plaintiff submitted a July 2004 statement from her sister, Alice Perez.  (TR. 111-119). Ms. Perez indicated that Plaintiff does a little house work in the morning, "but mostly sits with feet elevated watching T.V."  (TR. 111). Plaintiff's condition limits Plaintiff's ability

to put on her socks and shoes. (TR. 112). Plaintiff must sit to bathe and cut her hair short in order to comb it. (Id.). Plaintiff is unable to stand long enough to prepare her meals. (TR. 113). Plaintiff and her mother work together to complete household chores. (Id.). Plaintiff is able to do some house work but no yard work. (TR. 114). Plaintiff is able to drive and goes grocery shopping once a week for about an hour. (Id.). Plaintiff is able to pay bills, handle a savings account, count change and use a checkbook. (Id.). Plaintiff's condition limits her ability to lift, squat, bend, stand, reach, walk, sit, kneel, see, remember, stair climb, complete tasks, use her hands, concentrate, and understand. (TR. 116). Although Plaintiff is able to follow spoken instructions, she does not respond well to written instructions. (Id.). Plaintiff does not handle stress well. (TR. 117). Ms. Perez also stated that Plaintiff uses a cane, walker, splints for her arms, and glasses/contacts. (Id.). According to Ms. Perez, housework takes Plaintiff up to two-days to complete when, prior to her disability, Plaintiff used to be very active cleaning house without stopping, cleaning the yard, pushing their mother in her wheelchair, and playing with grandchildren. (TR. 118).

   D. The ALJ's Findings

     1. Claim Evaluation

  SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c), 416.920(c). In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities. *Id.* If the ALJ concludes that the impairment is not severe, the claim is denied. *Id.* If the ALJ makes a

finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.   20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[5] to perform past work.  20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id*. However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use

---

[5]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR §§ 404.1545, 416.945.

a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

### 2.    The ALJ's Decision

In his January 25, 2006 decision, the ALJ made the following findings:

1.    The claimant is insured for benefits through June 30, 2006.

2.    The claimant has not engaged in disqualifying substantial gainful activity at any time material hereto.

3.    The medical evidence establishes that the claimant has medically determinable "severe" impairments as described in the body of this decision [which are, "in combination...": right eye blindness, degenerative changes of the lumbar and cervical spine, degenerative changes of the right knee, status post meniscectomy and loose cartilage removal of the left knee, and obesity.  (TR. 26)].

4.    The claimant's impairments do not meet or equal the criteria of the impairments listed in Appendix 1, Subpart P, 20 CFR Part 404.

5.    The claimant retains the residual functional capacity delineated in the body of this decision [i.e., she is able to lift 20 pounds occasionally and ten pounds frequently; she is able to sit, stand and walk 6 hours per 8 hour workday; she is limited to occasional postural activity, except that she may frequently balance and use ramps but may never use ropes, ladders, and scaffolds; she must avoid concentrated exposure to hazards; and she is precluded from work that requires binocular vision.[6] (TR. 29)].

6.    The claimant is "approaching advanced [sic]," has a high school equivalent education, is functionally literate in English and has skilled and unskilled work experience.

7.    The claimant's residual functional capacity does not preclude her from working at her past relevant work as an assembler, medical products D.O.T. No. 712.687-010, classified as unskilled, light work, with an SVP of 2 and; as a sales clerk, retail trade, D.O.T. No. 290.477-014, classified as semiskilled, light work, with an SVP of 3, as these jobs are generally performed.

---

[6]As discussed *infra*, the ALJ also noted "some limitations in terms of higher level mental functioning."  (TR. 33).

8.    The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

<u>DECISION</u>

It is my decision that, based on the application filed on June 16, 2004, that the claimant is not eligible for a Period of Disability or Disability Insurance Benefits under sections 216(i) and 223 respectively, of the Social Security Act, at any time through the date of this decision.

(TR. 34-35).

In reaching his decision, the ALJ determined that the following alleged impairments were not severe: GERD; plantar fasciitis; fibromyalgia; elbow, hand and wrist pain; mental symptoms; and substance abuse.  (TR. 27-28).  He did not attribute "significant weight" to Physical Therapist McLearran's report because "a physical therapist is not an acceptable source for purposes of offering an opinion regarding a claimant's functional capacity..." and he found her "testing and findings  to be suspect."  (TR. 31).   He also concluded that Plaintiff's credibility was undermined by the objective medical evidence and "[i]nconsistent statements and actions...."  (TR. 32).   Additionally, in determining Plaintiff's RFC, the ALJ accepted the assessments of the State Agency physicians and, "because records introduced at the hearing demonstrate that the claimant is blind in her right eye..., I included the additional vision restriction noted."  (TR. 29).

The ALJ also rejected Dr. Campbell's and Nathan's opinions that Plaintiff's mental impairment was severe.  (TR. 27-28).  Citing Plaintiff's treatment records, his own observation of Plaintiff at the hearing, and the possibility that she may have exaggerated symptoms during Dr. Campbell's examination, the ALJ "consider[ed] her presentation during the consultative examination to be suspect and unreliable."  (Id.).  Instead, the ALJ accepted Dr. Tangeman's assessment that Plaintiff's "psychiatric symptoms are mild and do not rise to the level of 'severe.'" (TR. 28).  Although the ALJ found that Plaintiff's

mental impairments are mild, and as such, do not meet the regulatory definition of 'severe,' they are present and likely impose, in combination, with her psychogenic medications, some limitations in terms of higher level mental functioning.  Affording the claimant the full benefit of the doubt, I conclude

- 29 -

> that she is no longer capable of performing her past managerial and
> supervisory work because of these limitations.  However, a review of the
> D.O.T. reveals nothing in the job descriptions of retail clerk and assembler that
> remotely suggest that the claimant's residual functional capacity would
> preclude her from performing these jobs as they are generally performed in the
> economy.

(TR. 33).  The ALJ went on to find that Plaintiff, due to lifting restrictions, would not be able

to work as an assembler or retail clerk as she "actually performed" such work in the past.

(Id.).

  E. Proceedings Before the Appeals Council

  On July 14, 2006, Plaintiff's counsel submitted a request for review of the ALJ's

decision and additional evidence that had not been submitted to the ALJ.  (TR. 450-522).

  1. Additional Evidence Submitted to the Appeals Council

  The records discussed below were submitted to the Appeals Council after issuance of

the ALJ's decision.

- March 18, 2004 results from an MRI of Plaintiff's right knee showing degenerative changes, small joint effusion, and an "irregularity along the junction of the posterior horn and body of the medial meniscus suspicious for meniscal tearing."  (TR. 518).

- A June 8, 2004 Physical Residual Physical Capacity Questionnaire wherein Dr. Soltani indicated diagnoses of fibromyalgia and depression.  (TR. 487).  To support her findings, Dr. Soltani stated that Plaintiff had "tender points on exam" and she also stated that laboratory results and x-rays were negative.  (Id.).  Dr. Soltani stated that Plaintiff was capable of working at low stress jobs; she could sit for up to 10 minutes at one time before needing to get up; she could stand for up to15 minutes at one time; she could sit and stand a less than 2 hours in an 8-hour workday; Plaintiff must walk up to 10 minutes every hour during the workday; Plaintiff must be able to shift positions at will from sitting to standing; Plaintiff must take 30 minute breaks every 3 hours; she should never lift 10 pounds or less; Plaintiff could occasionally twist and stoop; and she could never crouch or climb ladders and stairs.  (TR. 488-490).  Dr.

- 30 -

Soltani expected that Plaintiff would miss work about four days per month.   (TR. 490).

• January 20, 2005 results of an MRI of Plaintiff's lumbar spine showing "[w]idely patent lumbar canal and foramina.  No disc herniations....Some facet degenerative joint disease at L5-S1 and to a lesser extent L4/5" and some minor degenerative disc disease changes with no canal or foraminal stenosis at T11/12.  (TR. 522).

• Dr. Mar's January 26, 2005 progress note reflecting Plaintiff's complaint that she was worse and felt pain and a tightness sensation from her back down the left leg.  (TR. 520).  On physical examination, Dr. Mar found that Plaintiff's "[m]otor and sensory of the lower extremities are within normal limits.  Straight leg raise seated is to 90 degrees bilaterally on the right with no pain and on the left she reports some pain around her left knee region."  (Id.)  Based upon his review of the January 20, 2005 MRI, Dr. Mar assessed L4-5 and L5-S1 facet arthritis.  (Id.).  He recommended consideration of L4-5 and L5-S1 facet injections, physical therapy, and weight loss.  (TR. 521).

• A June 23, 2005 letter from Amitab Puri, M.D., to Dr. Soltani indicating that he had seen Plaintiff for evaluation of obstructive sleep apnea syndrome, chronic fatigue, and breathlessness.  (TR. 512). Plaintiff reported that she had smoked for the past 20 years and that she continues to smoke a pack a day.[7]  (Id.).  On physical examination, Dr. Puri found Plaintiff to be morbidly obese and to have mild expiratory wheezing.  (Id.) He diagnosed asthma for which he prescribed Advair, GERD which he opined could be better controlled, and obstructive apnea.  (TR. 513).

• September 10, 2005 polysomnography study results of Plaintiff's  evaluation for obstructive sleep apnea syndrome.  (TR. 506-511).  Dr. Puri's impression was morbid

_____

[7]Elsewhere in the letter, Dr. Puri stated that Plaintiff "continues to smoke at the rate of a pack every three days."  (TR. 512).

obesity, mild upper airway resistence syndrome, and mild PLM disorder. (TR. 507). He indicated that weight loss was "imperative", recommended decreased caffeine, and a mandibular or nasal device. (Id.).

- A November 2, 2005 letter from Dr. Puri to Dr. Soltani indicating that Plaintiff's polysomnography showed "a BMI of 44.3 and mild OSAS with an AHI of 3.2 and RDI of about 5." (TR. 505). Plaintiff's asthma had improved with medication and her GERD was improved as well. Dr. Puri diagnosed OSAS for which he recommended weight loss and lateral positioning, COPD for which he prescribed Atrovent and Advair, hypothyroidism and GERD. (Id.).

- A March 2, 2006 letter from Dr. Puri to Dr. Soltani indicating that he had seen Plaintiff "back in 2005..." and that she had now returned with a 30 pound weight gain and complaints of increased snoring as well as apneic episodes, profound daytime hypersomnia, and hoarseness. (TR. 504). On examination, Plaintiff's Sats. were 95% and her chest was clear. (Id.). Dr. Puri opined that Advair could have caused Plaintiff's hoarseness. (Id.). He ordered another polysomnography. (Id.).

- April 24, 2006 polysomnography study results for sleep apnea. (TR. 496-503). Dr. Puri's impression was morbid obesity with a BMI of 51.2, PLM disorder without complaints of restless leg syndrome, and obstructive sleep apnea syndrome with hypoxia, consistent with obesity hypoventilation. (TR. 497). He indicated that weight loss was essential and recommended decrease in caffeine, discontinuation of smoking and a nasal CPAP. (Id.).

- A May 2, 2006 letter from Dr. Puri to Dr. Soltani discussing Plaintiff's polysomnography results and indicating that a "nasal CPAP at 13 cm with a chin strap was successful in alleviating her sleep disordered breathing." (TR. 495). Plaintiff's chest was clear and her Sats. were 94%. (Id.). He recommended that Plaintiff "[b]egin nasal CPAP..." and continue to lose weight. (Id.).

- Dr. Levi's May 9, 2006 treatment note that Plaintiff fell on April 6, 2006 and was

experiencing persistent pain and swelling in her knee.  (TR. 517)  On examination, Plaintiff "had some warmth and effusion and she is tender to palpation over the front of her knee, especially anterolaterally."  (Id.).  X-rays showed no evidence of fracture but Plaintiff had "degenerative changes and narrowing medially that has progressed from her last films."  (Id.)  Dr. Levi noted that Plaintiff weighed 284 pounds and her knees were degenerating as a result of her weight.  (Id.)  He assessed degenerative joint disease and possible lateral meniscal tear.  (Id.).  Dr. Levi and Plaintiff "had a long discussion about the importance of her losing weight."  (Id.).

- A May 17, 2006 letter from Dr. Soltani to "Whom It May Concern" stating that Plaintiff's

> medical problems include diabetes mellitus, hyperlipidemia, morbid obesity complicated by obstructive sleep apnea and obesity hypoventilation syndrome, major depression and fibromyalgia complicated by diffuse pain.

  (TR. 485).  Dr. Soltani also pointed out that "[o]ver the last several years..." Plaintiff has been evaluated by other specialists "without significant improvement in her symptoms of diffuse pain over all the major joints in her body preventing her from sitting or standing for any appreciable time as well as extreme shortness of breath with minimal ambulation."  (Id.).  Dr. Soltani "concur[red] with the methodology and results of the disability testing and evaluation as performed at ProActive Physical Therapy", which is where PT McLearran conducted Plaintiff's October 2005 evaluation.  (Id.).

- May 17, 2006 respiratory test results.  (TR. 492-494).

- Results from a May 18, 2006 MRI of Plaintiff's right knee showing prepatellar bursitis; degenerative joint disease, patellofemoral compartment, greater in medial and lateral compartments; small knee joint effusion; and no internal derangement.  (TR. 516).

- Dr. Levi's May 25, 2006 treatment note reflecting his review of the recent MRI.  (TR.

515).  He injected a mixture of Lidocaine, Marcaine and Aristospan.  (Id.).

Plaintiff also indicates that Dr. Soltani's July 11, 2006 "Treating Physician Report Regarding Fibromyalgia and Chronic Fatigue Syndrome" was included her in Exhibit 1 submitted to the Appeals Council.  (TR. 483; Plaintiff's MSJ, p. 31).  That Report does not appear with Plaintiff's Exhibit 1 in the Administrative Record.  Neither Plaintiff nor Defendant have summarized the Report in their respective Statement of Facts or briefs.

### 2.    The Appeals Council's Decision

On October 27, 2006, the Appeals Council issued its decision denying Plaintiff's request for review.  (TR. 5-8).  With regard to additional evidence submitted that post-dated the ALJ's decision, the Appeals Council stated:

> The Administrative Law Judge decided your case through January 25, 2006.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before January 25, 2006.
> If you want us to consider whether you were disabled after January 25, 2006, you need to apply again.  Social Security queries show that you have filed new claims in June 2006 and we are returning the evidence to you to use in your new claims.

(TR. 6).  As to the remaining additional evidence, the Appeals Council considered same and "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  (TR. 5-6).  The Appeals Council also rejected Plaintiff's claim that the ALJ did not sufficiently question her at the hearing.  "[R]eview of the recording shows that when the Administrative Law Judge asked your representative if he had any questions of you, he responded no and stated that the issues were addressed in his brief."  (TR. 6).

### III.    DISCUSSION

#### A.    Argument

Plaintiff raises multiple arguments that can be condensed as follows: : (1) the ALJ failed to give controlling weight to Plaintiff's treating physicians; (2) the ALJ's RFC determination was in error; (3) the ALJ's assessment of Plaintiff's symptoms, including pain, was in error; (4) the ALJ's determination  at step five was erroneous; and (5) the Appeals

Council erred when it failed to remand the matter to the ALJ for consideration of new evidence.[8] Plaintiff requests an immediate award of benefits or, alternatively, that the Court remand the matter for further proceedings.

Defendant asserts that the ALJ and the Appeals Council properly denied Plaintiff's claim.

B.    Standard of Review

An individual is entitled to disability insurance benefits if he or she meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423, 1382.  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

_____

[8]The Court agrees with Defendant's assertion that Plaintiff's brief, filed by counsel, is "disjointed." (Defendant's XMSJ, p.2).  Plaintiff's MSJ is far from a model in clarity.  Further, even though Plaintiff is correct that arguments raised before the Appeals Council may also be raised before the Court, counsel's filings with this Court should cite to the sequential page number affixed to the Certified Transcript/Administrative Record filed with the Court and not to the exhibit number assigned during the administrative proceeding.  Moreover, Plaintiff's counsel has cited a 2006 unpublished Ninth Circuit case in contravention of 9th Cir. R. 36-3 (2006).  *See also* Fed.R.App. P. 32.1 (2006-2009); 9th Cir. R.36-3 (2007-2009).

- 35 -

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id*. at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d

- 36 -

at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.      Analysis

1.      Evidence submitted for the first time to the Appeals Council

Plaintiff argues that the Appeals Council should have remanded the matter to the ALJ for consideration of the newly submitted evidence. (Plaintiff's MSJ, p.2).

Defendant argues that Plaintiff failed to explain how the evidence negatively impacted the ALJ's decision. Defendant also contends that records post-dating the ALJ's decision are not probative of Plaintiff's condition at the time of the hearing. (Defendant's XMSJ, p.11).

"'[I]n cases involving submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." *Bergmann v Apfel,* 207 F.3d 1065, 1068 (8th Cir. 2000); *see also Harman v. Apfel,* 211 F.3d 1172, 1180 (9th Cir. 2000) ("We properly may consider the additional materials because the Appeals Council addressed them in the context of denying Appellant's request for review.")

a.      Records considered by the Appeals Council

With regard to Plaintiff's supplemental records that the Appeals Council considered, the Appeals Council determined "that this information does not provide a basis for changing the Administrative Law Judge's decision." (TR. 6). *See* 20 C.F.R. §404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the

administrative law judge hearing decision").   Plaintiff has not specifically argued how the records that were considered by the Appeals Council would have changed the ALJ's decision.  Records concerning Plaintiff's knee and back do not undermine the ALJ's findings given that the ALJ was aware that Plaintiff suffered from degenerative changes in her knee and facet arthritis.  (*See* TR. 26 *citing* TR. 403-404 (ALJ citing Dr. Mar's diagnosis of facet arthritis)).  Dr. Puri's diagnoses indicated mild conditions, which improved with medication, prior to the ALJ's decision and there is no argument by Plaintiff that such findings when considered in combination with Plaintiff's other impairments resulted in disability as of January 25, 2006.

What is left, then, is Dr. Soltani's June 8, 2004 assessment prepared for Plaintiff's counsel.  Therein, Dr. Soltani indicated, among other things, that Plaintiff exhibited tender points on examination indicative of fibromyalgia.  As discussed, *infra*, remand is appropriate for consideration in light of this record.

### b.    Records not considered by the Appeals Council

The Appeals Council's decision was clear that Plaintiff's records post-dating the ALJ's January 25, 2006 decision were not considered because such information did "not affect the decision about whether you were disabled beginning on or before January 25, 2006."  (TR. 6).[9]

---

[9]The Appeals Council specifically identified the records to which it was referring: Dr. Puri's March 2, May 2, and May 17, 2006 reports; the April 24 2006 polysomnography study results; Dr. Levi's May 9 and May 25, 2006 reports; the May 18, 2006 MRI; and the July 11, 2006 chronic fatigue syndrome form from Dr. Soltani.  (TR. 6).  The Appeals Council did not specifically mention Dr. Soltani's May 17, 2006 letter to "Whom It May Concern."  In her letter, Dr. Soltani merely summarized the existing record.  Further, her endorsement of PT McLearran's method does not transform PT McLearran into an acceptable medical source under the regulations.  Moreover, Dr. Soltani was not present during the testing and, thus, had no direct knowledge of same. Consequently, even assuming that the Appeals Council considered Dr. Soltani's May 17, 2006 letter as additional evidence, the substantial evidence of record supports the Appeals Council's conclusion that this additional evidence did "not provide a basis for changing the Administrative Law Judge's decision."  (TR. 6).

- 38 -

The Court may remand a case to the Commissioner for consideration of new evidence when the plaintiff demonstrates that there is: (1) new evidence that is material; and (2) good cause exists for her failure to incorporate that evidence into the administrative record. *Sanchez v. Secretary,* 812 F.2d 509, 511 (9th Cir. 1987) (*citing Allen v. Secretary,* 726 F.2d 1470, 1472 (9th Cir. 1984)); 42 U.S.C. § 405(g)); *see also Bruton v. Heckler,* 724 F.2d 1415, 1417 (9th Cir. 1984) (applying same test to records that had also been submitted to the Appeals Council but which the Appeals Council did not appear to consider).   To satisfy the materiality requirement, Plaintiff must show "that the new evidence is material to and probative of [her] condition as it existed at the relevant time –at or before the disability hearing." *Sanchez,* 812 F.2d at 511.  Moreover, "the new evidence offered must bear directly and substantially on the matter in dispute."  *Bruton,* 724 F.2d at 1417 (new evidence was material where the issue had been expressly considered by the ALJ and was "squarely before the Appeals Council....").

With regard to the good cause requirement, "[i]f new information surfaces after the [Commissioner's] final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied."  *Key v. Heckler,* 754 F.2d 1545, 1552 (9th Cir. 1985).

Dr. Levi's records beginning May 9, 2006 regarding treatment after Plaintiff's fall in April 2006 are not relevant to Plaintiff's condition as of the date of the disability hearing. Thus, Plaintiff fails to meet the materiality requirement for remand.

Dr. Puri's records and related studies beginning March 2, 2006 could arguably be material to allegations that Plaintiff experienced shortness of breath after walking fifteen feet. (*See* TR. 31).  Plaintiff had previously seen Dr. Puri in June and November 2005.  (TR. 513, 505).  He found mild expiratory wheezing, diagnosed asthma, and prescribed Advair and that Plaintiff improved with medication.  (Id.).  Plaintiff did not seek treatment again from Dr. Puri until March 2, 2006–several months after the ALJ issued his decision. Dr. Puri's records beginning March 2, 2006 do not contain opinions about Plaintiff's condition between June

2005 and January 25, 2006.  Hence, Dr. Puri's records beginning March 2, 2006, shed little light on Plaintiff's condition on the date of the hearing before the ALJ.  Moreover, even if Dr. Puri's records beginning March 2, 2006 were material, Plaintiff "must establish good cause for not seeking the...opinion prior to the denial of [her] claim." *Clem,* 894 F.2d at 332 (*citing Key,* 754 F.2d at 1551).  Plaintiff has provided no reason why she waited to return to Dr. Puri  until after the ALJ's decision denying her claim.  Consequently, remand is not warranted with regard to Dr. Puri's records and related studies beginning March 2, 2006.

For the reasons set forth *supra* at n. 9, remand is not warranted for consideration of Dr. Soltani's 2006 letter.  Moreover, Plaintiff has failed to establish good cause for not submitting such a statement from Dr. Soltani, who had treated Plaintiff since at least April 2003, earlier.

### 2.    Severity of Plaintiff's Physical Impairments

The ALJ found that Plaintiff's GERD, fibromyalgia, upper extremity impairments, plantar fasciitis, and mental impairments, *inter alia*, were not "severe" impairments as defined in the regulations.  An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities for at least a consecutive twelve month period.  *See* 20 C.F.R. §§404.1520(a)(4)(ii), 416.920(a)(4)(ii); Social Security Ruling 96-3p.[10]  *See also* 20 C.F.R. 404.1520(c) ("it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.")  Thus,  "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 CFR §§ 404.1521(a), 416.921(a). *See also Bowen v. Yuckert,* 482 U.S. 137 (1987) (at step two, the Commissioner makes an initial

---

[10]Social Security Rulings ("SSR") "do not have the force of law....Nevertheless, they constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir. 1989)(citations omitted).

determination of medical severity without consideration of the claimant's age, education, and experience); SSR 96-3p (an impairment is "not severe" when medical evidence establishes only "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.") Basic work activities are "the abilities and aptitudes necessary to do most jobs..." such as walking, standing sitting and other physical functions; capacities for seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervisors, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 CFR. §§ 404.1521(b), 416.921(b).

The step-two inquiry is a *de minimis* screening device to dispose of groundless claims. *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir. 2005) (*citing* SSR 85-28); *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996).  "The regulations guiding the step-two determination of whether a disability is severe is merely a threshold determination of whether the claimant is able to perform his [or her] past work.  Thus, a finding that a claimant is severe at step two only raises a prima facie case of a disability."  *Hoopai v. Astrue,* 499 F.3d 1071, 1075 (9th Cir. 2007).

"[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb,* 433 F.3d at 687; *see also Orr v. Astrue,* 2008 WL 344528 (D. Ariz. February 7, 2008) (If a finding of non-severity is not clearly established by medical evidence, adjudication must continue through the sequential evaluation process.) Thus, substantial evidence must support the ALJ's finding "that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." *Webb,* 433 F.3d at 687. *See also Yuckert v. Bowen,* 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually accorded to the [Commissioner's] application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.")

a.      GERD

Defendant is correct that the substantial evidence of record supports the ALJ's finding that although Plaintiff has GERD, "there is no evidence that it imposes any significant work related limitations." (TR. 27). *See Verduzco v. Apfel,* 188 F.3d 1087, 1090 (9th Cir. 1999) (diagnosis of impairments, alone, does not support a claimant's allegation that those impairments are "severe" under the regulations.).

b.      Upper Extremities/Fibromyalgia

The ALJ determined that Plaintiff did "not have a 'severe' medically determinable elbow impairment." (TR. 27). Although the ALJ acknowledged that Plaintiff had been diagnosed with epicondylitis bilaterally, he found that Plaintiff's complaints of elbow pain were transitory. (*See* Defendant's XMSJ, p.3. He also found that Plaintiff's "medical record fails to demonstrate that the claimant's hand impairments have been symptomatic for twelve months or more, at any time." (TR. 27; *see also* Defendant's XMSJ, p.3 (Plaintiff's complaints of wrist and hand pain "were intermittent and, therefore, did not meet the twelve month duration requirement" to support a severity finding)).

Plaintiff argues that she wore braces to alleviate elbow pain. She also points out that Dr. Soltani diagnosed fibromyalgia and that Dr. Bowers, who examined her for bilateral elbow pain, noted a history of fibromyalgia. (Plaintiff's MSJ, p.10).

Before addressing Plaintiff's complaints of upper extremity pain, the ALJ dismissed the "multiple references to the claimant potentially having fibromyalgia...in the record" because

> this was seen primarily as a differential diagnosis in addition to chronic pain syndrome and other similar maladies. There is no evidence that other potential causes of generalized joint pain, including depression, were excluded as a cause of the claimant's symptoms or that trigger and control point testing, consistent with the CDC protocol, has ever been performed. Accordingly, I must conclude that fibromyalgia and other negative diagnosis conditions, such as chronic pain syndrome, have not been medically determined.

(TR. 26). The ALJ then addressed the severity of Plaintiff's elbow impairment separately from her allegation of hand and wrist impairments. (TR. 27).

Fibromyalgia "causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissues." *Benecke v. Barnhart,* 379 F.3d 587, 589 (9th Cir. 2004) (citations omitted).  Common symptoms of fibromyalgia, which Plaintiff herein also experiences, include chronic diffuse pain throughout the body; multiple tender points; sensitivity to stress and activity level; chronic fatigue; stiffness; and sleep disturbance.  *Id.* at 589-590*; Willis v. Callahan,* 979 F.Supp. 1299, 1303 n. 2 (D. Or. 1997).  "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community."  *Benecke,* 379 F.3d at 590.  *See also Sarchet v. Chater,* 78 F.3d 305. 306 (7th Cir. 1996) (fibromyalgia is "a common, but elusive and mysterious disease...")  Fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Benecke,* 379 F.3d at 590.  Although "[t]he American College of Rheumatology issued a set of agreed upon diagnostic criteria in 1990,...there are no laboratory tests to confirm the diagnosis."  *Id.*

On December 20, 2002, Plaintiff complained of painful joints relating to her hands. (TR. 349).  Both wrists were tender and small nodules were observed.  (Id.)  Plaintiff reported that rheumatoid arthritis ran in her family and the same diagnosis was suspected with regard to Plaintiff's complaints.  (TR. 349-350).  A March 2003 x-ray of Plaintiff's hands showed minor degenerative findings.  (TR. 348).  In April, 2003, Dr. Soltani recorded Plaintiff's complaints of pain in the knees, ankles, elbows, wrists, and clavicles.  (TR. 344). She assessed chronic pain and questioned whether Plaintiff suffered from degenerative joint disease or fibromyalgia.[11]  (TR. 345).  She prescribed wrist splints in addition to medication. (Id.).  In May 2003, when Plaintiff continued to complain of pain and numbness in her hands, Dr. Soltani continued Plaintiff on wrist splints and diagnosed: (1) "probable c[arpel] t[unnel] s[yndrome]" for which she ordered tests and continued Plaintiff on splints and NSAIDS; and (2) "probable fibromyalgia" for which she prescribed Elavil and told Plaintiff about a

---

[11]This is the first mention of fibromyalgia among Plaintiff's treating physicians.

fibromyalgia support group.  (TR. 342).

On July 23, 2003, Plaintiff, who was wearing braces, was examined by Dr. Foote for complaints of pain and paresthesias in her upper extremities which she had been experiencing during the previous two months.  (TR. 156).  Dr. Foote found that Plaintiff had dysesthesias to pinprick in some digits and a positive Tinel's sign at the left elbow.  (Id.).  He ordered EMG and nerve conduction studies which were negative.  (TR. 157, 337).

In September 2003, Plaintiff complained to Dr. Soltani about chronic pain in her neck, shoulders and hands.  (TR. 337).  Dr. Soltani "suspect[ed]..." fibromyalgia.  (TR. 338).  In October 2003 when Plaintiff continued to complain of "chronic diffuse pain", Dr. Soltani's assessment included "fibromyalgia" for which she prescribed Elavil, continued physical therapy, exercise and weight loss.  (TR. 334-335).  She also injected a Lidocaine mixture for epicondylitis.  (TR. 335).

In October 2003, Plaintiff began physical therapy regarding tenderness throughout her upper body and elbows and hands.  (TR. 182).  By her November 2003 discharge, her condition was unchanged.  (Id.).  During the fall of 2003, Plaintiff also attended physical therapy for her lower back, knees, and neck.  (TR. 177, 179-181, 329).

On November 14, 2003, Plaintiff returned to Dr. Soltani with complaints of diffuse pain in her lower back, elbows, knees and neck.  (TR. 329).   Dr. Soltani's diagnosis was "chronic pain/fibromyalgia..."  (TR. 330).  She continued Plaintiff on Elavil and discussed the importance of exercise as a component of treatment for fibromyalgia. (Id.).  In December 2003, when Plaintiff complained of pain in her elbows, knees, arms, and ribs, Dr. Soltani's assessment continued to be "chronic pain/fibromyalgia" and suggested Plaintiff begin tapering Elavil and start Neurontin.  (TR. 325-326; *see also* TR. 323).

In February, 2004, Dr. Soltani noted Plaintiff's "longstanding complaints of diffuse pain...primarily in her right elbow, right forearm, right wrist, bilateral hands, bilateral knees, and low back."  (TR. 323).  When discussing Plaintiff's symptoms, Dr. Soltani wrote "[p]ain syndrome, possible fibromyalgia, and degenerative joint disease."  (Id.).   Dr. Soltani's

assessment was "[b]ilateral hand, right elbow, and bilateral knee pain.  I believe that a large component of her pain symptom is related to fibromyalgia.  We have discussed this extensively in the past.  I have asked her to go ahead and start Neurontin and after an extensive discussion of risks and benefits, she does agree that she has to start." (TR. 324). Dr. Soltani's assessment also included obesity, and depression.  (Id.) She ordered further testing.  (Id.).

A February 2004 x-ray of Plaintiff's elbow was normal.  (TR. 322).

In May 2004, Dr. Soltani noted Plaintiff's continued complaints of chronic pain in her elbows, wrists, low back, knees, and ankles.  (TR. 318).  Her assessment included fibromyalgia for which she increased Plaintiff's Neurontin dosage and continued Plaintiff on Elavil and Arthrotec.  (TR. 319).  Also in May 2004, Plaintiff was examined by Dr. Bowers on referral from Dr. Soltani for evaluation of bilateral elbow pain.  (TR. 419).  Dr. Bowers noted Plaintiff's "history of fibromyalgia...."  (Id.).  He diagnosed bilateral medial epicondylitis with some right sided lateral epicondylitis.  (Id.)  He recommended bilateral tennis elbow supports, icing and continuation of anti-inflammatory medication.  (TR. 420). He also recommended consideration of injections if other treatment did not work.  (Id.).

Dr. Soltani's June 8, 2004 treatment note indicates "Fibromyalgia/chronic pain" and that she completed an "SSI PW."  (TR. 316).  Plaintiff submitted to the Appeals Council a June 8, 2004 Physical Residual Functional Capacity Questionnaire completed by Dr. Soltani. (TR. 487-491).  Therein, Dr. Soltani diagnosed fibromyalgia and depression.  She indicated that Plaintiff experienced symptoms of moderate chronic diffuse pain daily in her elbows, wrists, lower back, knees, ankles, and neck.  (TR. 487).  Dr. Soltani opined among other things that Plaintiff could: sit up to 10 minutes at one time; stand up to 15 minutes at one time; sit/stand/walk less than 2 hours total during an 8 hour work day; never lift 10 pounds or less; never climb ladders, climb stairs, crouch; and occasionally twist and stoop.  (TR. 489-490).

In July 2004, Dr. Soltani continued Plaintiff on Neurontin and referred her to a

fibromyalgia support group.  (TR. 312).

In December 2004, when Plaintiff complained of pain in her left neck, left shoulder, and left elbow, Dr. Vietti assessed "C6-7 cervical radiculopathy vs. flare her [sic] fibromyalgia."  (TR. 301).

The record also reflects that during this time Plaintiff was seen by Dr. Levi for complaints of knee pain and Dr. Mar regarding complaints of back pain.[12]  Both doctors noted that Plaintiff's weight severely and negatively impacted her joints.

The record reflects that Plaintiff consistently complained of upper extremity pain since December 2002. Defendant, in supporting the ALJ's characterization of Plaintiff's allegations of upper extremity impairments as transitory and intermittent, overlooks the significance of the  fact that Plaintiff has consistently complained of diffuse pain affecting many parts of her body and that Plaintiff's treating physician diagnosed and treated Plaintiff for fibromyalgia.  The ALJ dismissed fibromyalgia as a "differential diagnosis...."  (TR. Initially Dr. Soltani's assessment of fibromyalgia in April 2003 may have been differential. By May 2003, Dr. Soltani indicated "probable fibromyalgia."  (TR. 342).  In September 2003, Dr. Soltani "suspect[ed]" fibromyalgia.  (TR. 338).  In October 2003 Dr. Soltani prescribed Elavil for treatment of fibromyalgia. In November 2003 and December 2003, the diagnosis included fibromyalgia.  Although in February 2004, Dr. Soltani indicated that Plaintiff suffered from "[p]ain syndrome, possible fibromyalgia, and degenerative joint disease", use of the word "possible" does not detract from Dr. Soltani's statement in that same record that she "believe[d] that a large component of [Plaintiff's] pain symptom is related to fibromyalgia."  (TR. 324).  That Dr. Soltani believed Plaintiff suffered from fibromyalgia is also supported by her decision to prescribe Neurontin to treat the impairment despite possible risks to Plaintiff.  (Id.).   In June 2004, Dr. Soltani completed a form

---

[12]Plaintiff also complained to Dr. Mar about pain in her  left leg, and neck into her left arm.  (TR. 405).  Dr. Mar noted that he had approval to see Plaintiff for back pain only and not neck and arm pain.  (Id.).

wherein she indicated a diagnosis of fibromyalgia and cited Plaintiff's exhibition of tender points on examination and diffuse pain in her elbows, wrists, lower back, knees, ankles and neck. (TR. 487). The ALJ did not have the benefit of Dr. Soltani's June 2004 RFC assessment. However, even without that assessment the substantial evidence of record that was before the ALJ supports the conclusion that the diagnosis of fibromyalgia was more than a mere differential diagnosis and that Plaintiff had been treated for such condition for over 12 months and/or that such condition was expected to last for more than 12 months. Additionally, although the Appeals Council had the benefit of Dr. Soltani's June 2004 RFC assessment, the matter was not remanded for further consideration. Instead, the Appeals Council affirmed the ALJ's finding that fibromyalgia had not been medically determined primarily because no trigger point testing was performed. The record now contains Dr. Soltani's statement, contemporaneous to treatment, that tender point testing supported the fibromyalgia diagnosis. Consequently, the reasons provided by the ALJ to dismiss at step two Plaintiff's diagnosis of fibromyalgia are not supported by the substantial evidence of record.

"'[T]he decision whether to remand the case for additional evidence or to simply award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke,* 379 F.3d at 593 (*citing Harman,* 211 F.3d at 1178). Conversely, remand for an award of benefits is appropriate where: (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Benecke,* 379 F.3d at 593 (citations omitted). Dr. Soltani's diagnosis of fibromyalgia does not necessarily mean that the ALJ will accept same or adopt her RFC assessment. *See Magallenes,* 881 F.2d at 751 (the treating physician's opinion is not "necessarily conclusive as to either a physical condition or the ultimate issue of disability."). Nonetheless,

reassessment of the issue of fibromyalgia at Step 2 may affect the reminder of the sequential analysis. *See Webb,* 433 F.3d 683 (remanding where ALJ erred at step two).  Consequently, remand is warranted for further proceedings with regard to fibromyalgia.

c.      Plantar Fasciitis

The ALJ noted Plaintiff's 2001 "'moderate amount' of symptoms..." of plantar fasciitis for which Plaintiff underwent a fasciotomy in March 2002.  (TR. 27)   He further stated that following surgery, Plaintiff's symptoms "were noted to be improved...and all reference to the condition ceased after August 1, 2002,...indicating resolution.  This is a period of less than 12 months."  (Id.).  The ALJ also pointed out that there was no further mention of foot complaints "until August 2004, two full years later, when an x-ray study again noted the return of a plantar spur....Since that time, there has been little further mention of the claimant experiencing foot problems.  As such, I find that there is insufficient medical evidence demonstrating that the clamant's plantar fasciitis impairment has ever been 'severe' for twelve months or more, as required."  (Id.)

Plaintiff contends that the ALJ "failed to appreciate [her] plantar fasciitis."  (Plaintiff's MSJ, p.10).  According to Plaintiff, such condition was a contributory factor to her inability to work in 2002.   (Plaintiff's Reply, p.2) Plaintiff also contends that "[c]ontrary to Defendant's assertion, it was not 'cured' in 2002, since it recurred in 2004, and remained active for at least 12 months.  Indeed, it was active during the hearing in 2006."  (Id.).

Substantial evidence of record supports the conclusion that Plaintiff's first bout of Plantar fasciitis in December 2001 resolved by August 2002 and, thus, was not a "severe" impairment under the regulations.  This is especially so given that Plaintiff did not again complain of same until the condition reappeared two years later in August 2004.  Because medical records subsequent to August 2004 reflected "little further mention..." of such condition, the ALJ reasonably concluded that the recurrence of plantar fasciitis in August 2004 did not significantly limit Plaintiff's ability to perform basic work activities.  However, in September 2004, Dr. Estes noted "[d]ecreased strength in [Plaintiff's] left extensor hallicus

- 48 -

longus and diminished sensation dorsum of medial aspectd [sic] of left foot.  Gait normal until left heel syndrome in March '04 with durational problems of walking, stair climbing, squatting, or kneeling following treatment for same."  (TR. 223-224) It is unclear which record supports Dr. Estes' reference to left heel syndrome in March 2004.  The parties do not specifically address Dr. Este's statement and cite no records to support same with regard to the status of Plaintiff's plantar fasciitis as of March 2004.  It may well be that Dr. Estes meant to reference Plaintiff's March *2002* surgery for plantar fasciitis.[13]  Or, perhaps he intended to state *August* 2004 when an x-ray reflected the condition.

Even though Plaintiff sought to submit additional evidence to support her request for reconsideration, the records did not address plantar fasciitis.  Moreover,  Dr. Soltani's May 2006 letter submitted to the appeals council wherein she summarizes Plaintiff's medical problems makes no mention of plantar fasciitis.

Regardless, nothing in the record supports the conclusion that Plaintiff's plantar fasciitis detected in August 2004 had resolved before the ALJ reached his January 2006 decision.  The August 2004 x-ray indicated that the current plantar spur was slightly increased in size compared to the December 2001 x-ray which led to the 2002 surgery.  Because, as discussed *supra*, remand for further proceedings is necessary, the parties should also address the status of Plaintiff's plantar fasciitis from 2004 through the date of the hearing.  Even if it is determined that Plaintiff's condition is not "severe" under the regulation, it may well be that this non-severe medically determinable impairment should be considered in the RFC analysis nonetheless.  *See*   20 C.F.R. §§ 404.1545(a)(2); 416.945(a)(2). (RFC determination takes into account all "medically determinable impairments of which we are aware" including non-severe impairments).

---

[13]During a March 4, 2002 physical therapy evaluation, it was noted that Plaintiff was unable to climb stairs, squat or kneel secondary to knee pain.  (TR. 198).

d.    Mental Impairment

The ALJ determined that Plaintiff did not suffer from a severe mental impairment. (TR. 27-28).  In doing so, he rejected examining Dr. Campbell's and non-examining Dr. Nathan's reports.  (Id.)   The ALJ found that neither Dr. Campbell's nor Dr. Nathan's opinions were supported by Plaintiff's treatment records given that none of Plaintiff's treating mental health sources found the deficits noted by Dr. Campbell and relied upon by Dr. Nathan.  Instead, Plaintiff's treating mental health sources reported that Plaintiff's memory was intact as was her concentration, her other cognitive functions were "appropriate" and that she was of normal intelligence. (Id.).  The ALJ found that Plaintiff was able to respond appropriately to his questions at the hearing. (Id.).  The ALJ also cited "serious questions concerning [Plaintiff's] credibility..." to support his conclusion that Plaintiff exaggerated her symptoms during Dr. Campbell's examination thus rendering Dr. Campbell's examination "suspect and unreliable."  (TR. 28).  The ALJ also rejected Dr. Nathan's opinion because Dr. Nathan relied upon Dr. Campbell's findings.  (TR. 27-28).

Dr. Campbell's and Dr. Nathan's opinions are contradicted by Dr. Tangeman's opinion that Plaintiff suffered from a mild mental impairment.  Therefore, the ALJ must set forth specific and legitimate reasons for rejecting Dr. Campbell's and Dr. Nathan's opinions. *Magallanes,* 881 F.2d at 751; *Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir. 1995).  Defendant points out that "although Plaintiff subjectively complained of memory problems, she did not describe any examples to her counselors." (Defendant's XMSJ, p.4).  The record does not reflect that Plaintiff's mental health providers conducted testing similar to that administered by Dr. Campbell.  Nonetheless, Plaintiff's  most recent GAF score of record was 65 in June 2004. (TR. 264).  GAF Scores range from 1-100.   American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, p.32 (4th ed.). In arriving at a GAF score, the clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Id.*  Physical and environmental factors are not included.  *Id.*  A GAF score between 61 and 70 indicates

- 50 -

"[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* (emphasis omitted). Thus, the GAF score assessed by Plaintiff's treating mental health providers supports the ALJ's statement that her treatment records did not reflect the severity indicated by either Dr. Campbell or Dr. Nathan.

Defendant cites authority in support of the proposition that the ALJ, when evaluating credibility, can consider a plaintiff's demeanor during the hearing.  (Defendant's XMSJ, p.5 *citing Thomas v. Barnhart,* 278 F.3d 947, 960 (9th Cir. 2002)); *see also Verduzco,* 188 F.3d 1087.  However, it is not clear on this record that the ALJ–during the nine-minute hearing–could appropriately assess Plaintiff's cognitive functioning, intelligence, and other aspects assessed by Dr. Campbell during his examination.  The ALJ's questions primarily concerned Plaintiff's living situation, her family, her weight, and why she did not believe she could work.  Plaintiff's ability to answer such questions to the ALJ's satisfaction was consistent with Dr. Campbell's assessment that Plaintiff's speech was normal, she knew current information such as the names of the current and prior President, "[s]he knew details about her life and was an adequate historian", and that she could concentrate for two hours at a time on simple tasks.  (TR. 388-389).

The analysis turns to the ALJ's decision to discount Plaintiff's credibility, which Plaintiff argues was erroneous.  When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue,* 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms, the ALJ's reasons for rejecting the claimant's symptom testimony must be specific, clear and convincing.   *Carmickle v. Commissioner,* 533 F.3d 1155, 1160-1161 (9th Cir. 2008); *Tomasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008); *Orn,* 495 F.3d at 635.  Additionally, "[t]he

ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen,* 80 F.3d at 1284; *see also Orn,* 495 F.3d at 635 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007);  *Smolen,* 80 F.3d at 1284.  *See also Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 884 (9th Cir. 2006) ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his [or her] testimony and his [or her] own conduct; or on internal contradictions in that testimony.") "[A]n ALJ cannot reject a claimant's subjective pain or symptom testimony simply because the alleged severity of the pain or symptoms is not supported by objective medical evidence." *Lingenfelter,* 504 F.3d at 1040 n.11.

The ALJ cited a lack of objective medical evidence to support Plaintiff's pain allegations.  (TR. 32).  He also pointed out that: Plaintiff's mental health providers never documented the severe cognitive condition and borderline intelligence noted by Dr. Campbell; Plaintiff appeared at her physical therapy evaluation with a cane even though "there is no indication that an assistive device is necessary for her to ambulate anywhere in the medical record" and her gait is entirely normal; and Plaintiff's "primary care physician acknowledges that despite a myriad of diagnostic testing, little has been found wrong with the claimant beyond 'some mild arthritis in her knees'....The above strongly indicates that there is a reason doctors can find little wrong, the claimant is exaggerating, if not, feigning symptoms." (Id.)  He also cited inconsistencies in Plaintiff's statements regarding caring for

her mother and inconsistencies between Plaintiff's and Ms. Perez's statements. (Id.).

As discussed, *supra*, this matter must be remanded for further proceedings regarding the ALJ's finding that fibromyalgia was not a "severe" impairment. Under such circumstances, the ALJ's credibility finding must be reassessed in light of further proceedings with regard to fibromyalgia. Reassessment of Plaintiff's credibility may, in turn, affect the ALJ's consideration of Dr. Campbell's and Dr. Nathan's reports.

### 3.    Physical Therapist McLearran's Report

In an attempt to bolster PT McLearran's evaluation, Plaintiff claims that the tests were based on a protocol designed by a disability expert. (Plaintiff's MSJ, p.5). Plaintiff quotes what appears to be excerpts of advertisements[14] and testimony from unrelated state industrial commission proceedings about the protocol and PT McLearran's reputation. (Id. at pp. 6-7). Defendant objects to Plaintiff's "extra record evidence..." cited without the benefit of "a full case citation..." or an explanation of the context of the testimony. (Defendant's XMSJ, p.9 n.3). Defendant also points out that there is no indication that Dr. Davis and Dr. Grimes, who are quoted by Plaintiff, examined Plaintiff or reviewed her test results. Defendant's argument is well-taken and the Court declines to consider such line of argument from Plaintiff.

The question remains, however, whether the ALJ properly assessed PT McLearran's findings. Noting that PT McLearran had no treatment relationship with Plaintiff and that the report was specifically prepared for Plaintiff's counsel for purposes of the hearing, the ALJ considered PT McLearran as "a physical therapy consultant, only." (TR. 31). In rejecting PT McLearran's findings, the ALJ first noted that "a physical therapist is not an acceptable source for purposes of offering an opinion regarding a claimant's functional capacity, I therefore find, her opinions are not entitled to significant weight, in this regard." (Id.). He

---

[14]Plaintiff has not disputed Defendant's assertion that "the tone [of one excerpt] suggests that it was copied from commercial advertising literature designed to promote and sell the doctor's 'disability testing' product." (Defendant's XMSJ, p.9 n.3).

further stated that although Plaintiff used a cane during the examination

> there is no mention of claimant using, much less needing to use, a cane in the medical record....Further, there is not a scintilla of evidence in the medical record that her symptoms are so profound, or that she is so deconditioned, that she is short of breath after walking fifteen feet, or that she is so infirmed that she can sit for less than ten minutes.  Neither this, nor anything remotely similar, has ever been reported by the claimant to any of the treating sources at any time.  Clearly, the claimant's doctors would be the first to know if she could barely sit or walk. There simply is no other medical or opinion evidence that would remotely support such extreme limitations.

(Id.).  Consequently, the ALJ found PT McLearran's "testing and clinical findings to be wholly unsubstantiated by and inconsistent with the medical record...."  (Id.).

The regulations "distinguish[] between those opinions coming from 'acceptable medical sources' and those coming from other 'sources.'" *Gomez v. Chater,* 74 F.3d 967, 970(9th Cir. 1996) (*citing* 20 C.F.R. §404.1513(a), (e); 20 C.F.R. 416.913(a), (e)) ("a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not.").  The regulations set forth "no specific guidelines for the weighing of opinions from other sources.  This permits the Commissioner to accord opinions from other sources less weight than opinions from acceptable medical sources." *Id.* at 970-971.  *See also* SSR 06-03P.  Acceptable medical sources specifically include licensed physicians, licensed psychologists, licensed optometrists, and licensed podiatrists, but not physical therapists such as PT McLearran. *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d).

The SSA has identified the following factors that may be applied to opinion evidence from "other sources" on a case by case basis: length of relationship and frequency of appointments; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or expertise related to the individual's impairments; and any other factors that tend to support or refute the opinion.  SSR 06-03p.  "Not every factor for weighing evidence will apply in every case." *Id.*  The SSA has also recognized that in some instances it may be appropriate to give more weight to the opinion

of a medical source who is not an "acceptable medical source" than to the opinion of a treating source.  *Id.*

The ALJ properly observed that PT McLearran had seen Plaintiff only once and that, on the record before the him, PT McLearran's findings were inconsistent with the medical record.  However, the record before the Appeals Council contained Dr. Soltani's June 2004 RFC determination that is similar to the limitations assessed over one year later by PT McLearran.  Consequently, the matter should be remanded for reconsideration of PT McLearran's report in light of Dr. Soltani's June 2004 RFC assessment.  Additionally, further proceedings with regard to fibromyalgia and plantar fasciitis may affect consideration of PT McLearran's report as well.

In rejecting PT McLearran's October 2005 report, the ALJ dismissed Plaintiff's use of a cane during her appointment because "there is no mention of the claimant using, much less needing to use, a cane in the medical record."  (TR. 31).[15]  Upon remand the ALJ should note that Dr. Quint, when discussing Plaintiff's first bout of  "left heel spur syndrom", noted that Plaintiff "[m]ay benefit by use of crutches...."  (TR. 149).  On August 9, 2004, another heel spur, slightly larger than the previous, was detected and the record does not reflect that such condition had been resolved by Plaintiff's February and October 2005 appointments with Dr. Campbell and PT McLearran, respectively.  (TR. 309).  Additionally, an August 26, 2004 note from La Frontera indicated that plaintiff had a cane.  (TR. 256).  On August 30, 2004, upon discharge from the hospital regarding complaints of knee pain, Plaintiff was instructed to use a walker because "[s]he cannot use crutches...."  (TR. 219 (also noting that Plaintiff had "a walker at home.")).  Plaintiff stated in her November 2004 Function Report that she used a cane.  (TR. 91).  Additionally, Plaintiff's sister stated in July 2004 that

_____

[15]The ALJ also cited Plaintiff's use of cane during her appointments with PT McLearran and Dr. Campbell to discount Plaintiff's credibility in general.  (TR. 32).  Thus such information is also relevant to further proceedings regarding the ALJ's credibility determination.

Plaintiff used a walker and a cane. (TR. 117). The record also reflects that Dr. Levi stressed time and again that Plaintiff's obesity caused excess pressure on her knees joints with every step she took. Nor is it unreasonable to conclude that "a morbidly obese person..." with back problems, knee problems, fibromyalgia, and plantar fasciitis may use a cane. (Plaintiff's MSJ, p.26).

### 4.    Obesity

Plaintiff argues that "[t]he ALJ erred in not considering obesity as medically equivalent to a listed impairment." (Plaintiff's MSJ, p.14). Plaintiff asserts that the "SSA will find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing." (Id. at p.15). Thus, Plaintiff argues that the obesity may meet a required listing if it increases the severity of coexisting or related impairments such as musculoskeletal, respiratory, cardiovascular or mental impairments. Plaintiff also argues that the ALJ failed to consider her obesity in combination with her other impairments.

The ALJ cited "evidence that [Plaintiff] weighs at least 280 pounds...." (TR. 31) He found that although Plaintiff's obesity contributed to her aches and pains, "obesity, independently..." was not a significant medical impairment. (Id.). He also noted that there was no evidence of congestive heart failure or coronary artery disease. (Id.) As discussed *supra*, remand is necessary to further evaluate the severity of Plaintiff's fibromyalgia, plantar fasciitis, and mental impairments, which may, in turn, affect the ALJ's assessment whether Plaintiff's obesity in combination with Plaintiff's other impairments meets or equals a listing and/or impacts Plaintiff's RFC.

### 5.    Vision

Plaintiff, citing blindness in her right eye and "20/50" vision in her left, asserts that the ALJ erroneously "dismissed her disabling vision status...." (Plaintiff's MSJ, p.9). The ALJ stated:

the claimant is blind in her right eye.  She apparently sustained a BB gun injury at the age of six...As a result, records show that she only perceives light in that eye....However, there is no indication that her vision in her left eye is not correctable to, or near, 20/20.  As such I find no reason to impose more than monocular vision limitations.

(TR. 31).

In October 2004, Dr. Levine indicated that Plaintiff had "20/30$^{-2''}$ vision in her left eye. (TR. 244, 448).   He also noted that Plaintiff wore over-the-counter reading glasses.  (Id.). Although on July 1, 2005 Plaintiff's vision in her left eye was assessed at 20/50 (TR. 447), by July 19, 2005, her vision was at 20/25 (TR. 446) and remained so through at least October 2004 which is the last treatment note relating to vision in the record.  (TR. 445). The substantial evidence of record supports the ALJ's conclusion with regard to Plaintiff's vision.

<u>6.     Development of the Record</u>

Because remand for further proceedings is appropriate, Plaintiff's argument that the ALJ failed to develop the record is moot.  The record reflects that Plaintiff's counsel's decision not to question Plaintiff during the hearing largely contributed to Plaintiff's claim herein that the record was not properly developed.

**IV.     CONCLUSION**

Remand is necessary for the further proceedings with regard to evidence of fibromyalgia including Dr. Soltani's June 2004 report and RFC which may, in turn, affect the ALJ's severity analysis and his findings with regard to Plaintiff's allegations of mental impairment, PT McLearran's report, Plaintiff's credibility, and impact of Plaintiff's obesity. In short, consideration of the fibromyalgia evidence including Dr. Soltani's June 2004 report may affect the entire sequential disability analysis.  *See e.g., Bunnell v. Barnhart*, 336 F.3d 1112, 1115-1116 (9th Cir. 2003) (remanding where outstanding issues, must be resolved before a disability determination can be made).  The ALJ should also reassess the severity of Plaintiff's plantar fasciitis and the impact, if any, of same on Plaintiff's RFC regardless whether such condition is deemed severe.  *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). Because outstanding issues must be resolved before a determination of disability can be

- 57 -

made, remand for an award of benefits is not warranted.

## V.      RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court:

(1)     grant Plaintiff's Motion for Summary Judgment (Doc. No. 14) to the extent that this matter should be remanded for further proceedings; and

(2)     deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 20).

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CV 06-657-TUC-FRZ**.  A party may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).   Failure to file timely objections to any factual or legal determination of the Magistrate Judge may be deemed a waiver of the party's right to *de novo* review of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 29th day of May, 2009.

_____

Héctor C. Estrada
United States Magistrate Judge